[Cite as *In re G.B.*, 2025-Ohio-5803.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

|  |  |  |
|---|---|---|
| IN RE: | : | |
| | | CASE NOS. CA2025-07-062 |
| G.B. | : | CA2025-07-063 |
| | : | OPINION AND |
| | | JUDGMENT ENTRY |
| | : | 12/30/2025 |
| | : | |
| | : | |

APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. 24-D000013

Dearie, Fischer & Martinson LLC, and John A. Fischer, for appellant, Grandfather

Holly M. Simpson, for appellant, Grandmother

David P. Fornshell, Warren County Prosecuting Attorney, and Kirsten A. Brandt, Assistant Prosecuting Attorney, for appellee.

**O P I N I O N**

**PIPER, J.**

{¶ 1} Appellants, G.B.'s paternal grandparents (individually, "Grandfather" and

"Grandmother," collectively, "Grandparents"), separately appeal the decision of the Warren County Court of Common Pleas, Juvenile Division, granting permanent custody of their grandson, G.B., to appellee, Warren County Children Services ("WCCS"). For the reasons outlined below, we affirm the juvenile court's decision.

**Facts and Procedural History**

*G.B.'s Family History and Necessary Background Information*[1]

{¶ 2} On September 20, 2017, G.B.'s mother gave birth to G.B., a boy. G.B. tested positive for drugs at the time of his birth. This resulted in a safety plan being issued by WCCS that placed G.B. in the temporary care of Grandparents. Nearly one year later, on July 29, 2018, G.B.'s mother passed away from a purported drug overdose. The following year, on June 4, 2019, Grandparents obtained legal custody of G.B. Following another year, on June 20, 2020, G.B.'s father also passed away from a purported drug overdose. Grandparents never adopted G.B. following his father's passing. Grandparents merely retained legal custody of G.B. This resulted in G.B. becoming an orphan.

{¶ 3} On May 18, 2022, G.B.'s paternal uncle ("Uncle") was arrested and charged with operating a motor vehicle while under the influence of drugs. Uncle was also charged with child endangering. The charges arose after Uncle, who is in his 40s, overdosed while operating a motor vehicle in which the then four-year-old G.B. was a front-seat passenger. Uncle was revived following the administration of Narcan.[2] Uncle pled guilty to both charges and was thereafter sentenced to serve 180 days in jail, less nine days of jail-time

---

1. We note that, for reasons that will become clear in our discussion of Grandfather's first assignment of error, the materials this court used to summarize G.B.'s family history and necessary background information came almost entirely from the documents contained within the record rather than anything that may have been testified to at the hearing held on WCCS' motion for permanent custody.

2. "Narcan is a form of naloxone that is used for the emergency treatment of a known or suspected opioid overdose." *State v. Hensgen*, 2017-Ohio-8793, ¶ 2, fn. 1 (12th Dist.).

credit, 120 days of which were suspended. Uncle was also placed on community control for a period of five years. Uncle has since twice violated the conditions of his community control. These violations resulted in Uncle being sent back to jail in both 2024 and 2025.

{¶ 4}   G.B. is currently eight years old and in the second grade. G.B. has educational difficulties. To that end, G.B. is schooled in accordance with an education program that is tailored to address his individual needs. G.B. was not properly potty trained until he was six years old and in the temporary custody of WCCS. Prior to then, when G.B. was in the legal custody and care of Grandparents, G.B. was still wearing diapers. The record indicates that Grandparents took neither the time nor the effort to properly potty train G.B. prior to his removal from their care given their belief that G.B. would eventually grow out of it and learn how to use the bathroom on his own.

{¶ 5}   Grandparents are both in their 60s and are generally considered to be in poor health. The record indicates that Grandparents have difficulty managing schedules, attending important appointments, understanding processes, remembering dates, and seeking assistance when needed. The record also indicates that Grandparents, upon receiving legal custody of G.B., had difficulty regulating G.B.'s behaviors and ensuring that G.B. regularly attended school. Grandparents are not employed. Grandparents' primary source of income comes in the form of social security benefits. This results in Grandparents living on a fixed income that makes it very difficult for Grandparents to make ends meet.

{¶ 6}   Uncle, when not incarcerated or residing in a drug rehab facility, often finds himself living with and relying on Grandparents for shelter and support. This includes Uncle residing in Grandparents' new two-bedroom rental home as recently as one month prior to the hearing held on WCCS' motion for permanent custody. Grandparents moved

into this new rental home after their previous home was foreclosed upon during the pendency of this case. Grandparents allowed this to happen on at least two separate occasions after Uncle called them asking for a ride home following his most recent stints in both drug rehab and in jail. This occurred despite Grandparents having previously told WCCS that they did not want Uncle to learn of their new address in hopes of one day being reunified with G.B.

*Proceedings Relevant to this Appeal*

{¶ 7}   On December 25, 2023, WCCS received a referral regarding the then six-year-old G.B. This referral indicated that G.B. may be a victim of neglect. After receiving this referral, WCCS responded to Grandparents' home. Once there, WCCS discovered Grandparents' home to be in a deplorable condition with "stuff" strewn everywhere. WCCS also discovered that G.B. was wearing a diaper that had resulted in him receiving a significant diaper rash. This was in addition to WCCS discovering that Uncle had been residing in Grandparents' home with G.B. This was a concern to WCCS given its knowledge of Uncle's significant history of substance abuse and mental health issues. This included Uncle's history of abusing drugs such as heroin and methamphetamine.

{¶ 8}   Upon making these discoveries, and upon Uncle refusing to submit to a drug screen, WCCS instructed Grandparents that Uncle could no longer reside in their home with G.B. if he was still using and testing positive for drugs. Grandparents advised WCCS that they understood. However, during an unscheduled visit to Grandparents' home approximately six weeks later on February 6, 2024, WCCS discovered that Uncle was still residing in the home with G.B. This prompted WCCS to again instruct Grandparents that Uncle could not reside in their home with G.B. if he was still using and testing positive for drugs. Grandparents again advised WCCS that they understood.

Nevertheless, three days later, during a scheduled visit to Grandparents' home on February 9, 2024, WCCS found Uncle was *still* residing in the home with G.B. It was at this time that Uncle submitted to a drug screen. That drug screen tested positive for heroin and prescription Subutex.[3] This resulted in WCCS implementing a safety plan that placed G.B. in the care of his maternal grandparents.

{¶ 9} On February 20, 2024, G.B.'s maternal grandparents notified WCCS that they could no longer care for G.B. given G.B.'s pronounced behavioral issues. Upon being so advised, WCCS filed a complaint with the juvenile court alleging G.B. was a dependent child. Upon receiving WCCS' complaint, the juvenile court held an emergency shelter care hearing. Following this hearing, the juvenile court issued a decision that placed G.B. into the care of Grandparents with protective supervision of G.B. awarded to WCCS.

{¶ 10} In so ruling, the juvenile court noted that its decision was based upon it finding G.B. was being placed at risk due to Uncle's continued drug use while residing in Grandparents' home. The juvenile court noted that this was in addition to Grandparents' repeated failures to comply with WCCS' directive to remove Uncle from their home if he was still using and testing positive for drugs. G.B. was thereafter appointed with a court appointed special advocate ("CASA") and Grandparents with their own, individual counsel. Grandparents were also ordered not to permit Uncle to reside in their home with G.B. so long as Uncle was still using and testing positive for drugs. The juvenile court further ordered Grandparents to take and complete parenting classes. Grandparents advised both WCCS and the juvenile court that they understood the court's orders.

{¶ 11} On April 17, 2024, the juvenile court held an adjudicatory hearing. Following that hearing, the juvenile court issued a decision that adjudicated G.B. a dependent child.

---

3. Subutex, like Suboxone, is a medication developed for the treatment of opioid addiction.

This adjudication was made based upon a stipulation of facts. Those stipulated facts were identical to the facts WCCS alleged in its complaint as set forth above. This included a stipulation regarding Uncle's significant history of substance abuse. Two days later, on April 19, 2024, WCCS filed a case plan with the juvenile court. Both Grandparents and Uncle signed the case plan. Within that case plan, WCCS stated its concerns as follows:

> The consistent concern for the family has been [Grandfather] and [Grandmother] to allow [Uncle] in the home knowing his substance use history, mental health concerns and lack of compliance with [WCCS]. [Grandfather] is reported to be an alcoholic and both he and [Grandmother] are active heroin users. There are concerns that paraphernalia may be left around for [G.B.] to get ahold of. There are concerns for [G.B.'s] school attendance issues as [Grandfather] will not take him to school. There are concerns that [Grandparents] are not taking [G.B.] to doctors' appointments regularly.

{¶ 12} WCCS stated that it was also concerned by Grandparents having previously "allowed [G.B.] to be around [Uncle] while [Uncle] is using illegal substances." WCCS noted that its concerns could be addressed through Grandparents taking parenting classes and by Uncle obtaining and maintaining his own safe, stable housing. This was in addition to Grandparents and Uncle all becoming and remaining clean and sober. The case plan further notified Grandparents that they were not to associate with or allow "known substance abusers" in their home or around G.B. The juvenile court approved the case plan on April 29, 2024.

{¶ 13} On May 15, 2024, the juvenile court held a disposition hearing. Following this hearing, the juvenile court issued a dispositional decision that granted temporary custody of G.B. to Grandparents with protective supervision over G.B. awarded to WCCS.

{¶ 14} On September 26, 2024, WCCS filed an emergency motion requesting it be awarded with temporary custody of G.B. To support its motion, WCCS notified the juvenile court that Uncle had recently moved back into Grandparents' home with G.B. following

his most recent release from drug rehab. WCCS also notified the juvenile court that Uncle, although having just recently been released from drug rehab, had submitted to a drug screen that tested positive for methamphetamine. This is in addition to WCCS notifying the juvenile court that when it went to Grandparents' home to confront Grandparents about these issues that Uncle was there "acting erratically; he was shaking uncontrollably and making suicidal statements."

{¶ 15} WCCS further notified the juvenile court that Grandfather attempted to explain away Uncle's strange behavior as "just his bipolar" and that Uncle would soon "calm down." WCCS additionally notified the juvenile court that, after speaking with Grandfather, it asked Grandparents if they knew Uncle had tested positive for methamphetamine. WCCS notified the juvenile court that Grandparents replied that "they did not know how he could have been" because "they had kept him in the home to monitor him after his release from treatment." The juvenile court granted WCCS' emergency motion for temporary custody of G.B. later that same day. WCCS then placed G.B. with a foster family. G.B. has remained with that foster family ever since.

{¶ 16} On January 31, 2025, WCCS moved the juvenile court for permanent custody of G.B. To support its permanent custody motion, WCCS noted that Grandparents had been allowing Uncle to reside with them at their home with G.B. all the while Uncle was still using and testing positive for drugs. This included Uncle testing positive for methamphetamine, amphetamine, THC, methadone, and dextromethorphan. The juvenile court held a hearing on WCCS' motion for permanent custody on June 23, 2025. During this hearing, the juvenile court heard testimony from two witnesses. Those two witnesses were Grandfather and the ongoing caseworker assigned to G.B.'s case, Cayley Saunders.

{¶ 17} As part of this testimony, Grandfather testified and specifically acknowledged that he and Grandmother had repeatedly allowed Uncle to reside in their home with G.B. despite WCCS telling them on multiple occasions that Uncle was not permitted to live in their home with G.B. if he was still using and testing positive for drugs. Grandfather also admitted that he and Grandmother had continued to allow Uncle to live in their home even after G.B. had been removed from their care despite knowing Uncle's presence in their home was directly impacting their ability to reunify with G.B.

{¶ 18} This testimony also included Saunders testifying that Grandparents had failed to complete the entirety of their case plan services prior to WCCS filing its motion for permanent custody. This included, most notably, Grandparents not attending their required parenting classes until two months after WCCS had already filed its permanent custody motion. But, even then, Saunders testified that "the point of the parenting classes is for parents to learn how to change the behavior that [WCCS] has concerns with." Therefore, while it may be true that Grandparents had eventually attended their required parenting classes, Saunders testified that Grandparents "have not changed. They are still allowing, they have still allowed, up until a month ago, allowing [Uncle] in the home, allowing [Uncle] to live with them."

{¶ 19} Saunders further testified with respect to how G.B. was now doing under the care of his foster family. This included Saunders testifying that G.B. was "fully potty trained" within a month of being placed with his foster family who had "no issues with that." This also included Saunders testifying as to the following when asked about how G.B. was doing in school:

> He has been doing great. His reading has improved. His behavior has improved. He has made friends. It's reported that he's a leader in the classroom. They have not had any incident reports, any behavior concerns, he's doing very well.

{¶ 20} Saunders additionally testified that G.B. has a "very close relationship" with his foster mother and that he has a "very, very, very close relationship" with his foster family's 11-year-old son. This is in addition to Saunders testifying that G.B.'s foster family has had "zero behavior issues" with respect to G.B. and that G.B.'s foster family ensures that G.B. receives all the necessary care and support that he needs to address his mental and physical health issues.

{¶ 21} On June 27, 2025, the juvenile court issued a decision granting WCCS' motion for permanent custody. In so ruling, the juvenile court found that G.B. had "adjusted well" to his foster family who had potty trained him within a month after being placed into their care. The juvenile court also found G.B. was "bonded to that family and is close to the 11-year-old who lives there." The juvenile court further found that G.B.'s schoolwork and reading had improved since being placed with his foster family, that his "behavior issues [had] subsided," and that "[h]is attendance [at school was] better and all of his mental health issues [were] being addressed."

{¶ 22} The juvenile court additionally found that granting WCCS' permanent custody motion was in G.B.'s best interest, whereas continuing the case for another six months or returning G.B. to the legal custody and care of Grandparents was not. This finding was consistent with the CASA's report and recommendation finding a grant of permanent custody to WCCS would be in G.B.'s best interest. In finding G.B.'s best interest would be served by granting WCCS' permanent custody motion, the juvenile court noted, in pertinent part, the following:

> There is no evidence that [Grandparents have] any diagnosed health or mental issues. What they do have is the inability to limit [Uncle's] access to their house and to [G.B.] They have enabled [Uncle] his entire life. He is either in jail or living with [Grandparents]. They claim they are not able to tell when he is on drugs, but that's simply not credible. They either see

what they want to see or they choose to turn a blind eye to his drug usage. If [G.B.] was to go back to [Grandparents], and [WCCS'] involvement would end, there is no question in the Court's mind that they would reunify [Uncle] with [G.B.]

The juvenile court continued by stating:

[G.B.] was already a victim of [Uncle's operating a vehicle while under the influence]. [Uncle] was fortunate nothing bad happened to [G.B.] The Court is not willing to tempt fate and subject [G.B.] to another risky venture. [Grandparents] believe they have done everything asked of them, yet it took almost a year for them to complete their parenting classes. Also, their failure to appreciate the significant drug issues that [Uncle] has is also a great concern for [WCCS] and the Court. They have made promises that they will shield [Uncle] from [G.B.], but time and time again [Uncle] shows up at [Grandparents'] home and they don't do anything to remove him. It is only now that [Grandparents] say they will ensure [Uncle] doesn't return home. It's simply not believable based on prior experiences.

{¶ 23} On July 14, 2025, Grandmother filed a notice of appeal. Two days later, on July 16, 2025, Grandfather filed his own notice of appeal. This court consolidated Grandparents' appeals for review on August 13, 2025. Grandparents' consolidated appeal was thereafter submitted to this court for consideration on December 3, 2025. Grandparents' appeal is now properly before this court for decision; Grandparents have raised a collective six assignments of error for review.

**Grandfather's Appeal**

{¶ 24} Grandfather has appealed the juvenile court's decision to grant permanent custody of G.B. to WCCS. To support his appeal, Grandfather has raised two assignments of error for review.

*Grandfather's Assignment of Error No. 1:*

{¶ 25} THE TRIAL COURT ERRED BY GRANTING PERMANENT CUSTODY TO WCCS.

{¶ 26} In his first assignment of error, Grandfather argues the juvenile court erred

- 10 -

by granting WCCS' motion for permanent custody. To support this argument, Grandfather claims the juvenile court committed plain error by admitting and relying upon inadmissible hearsay evidence when making its decision to grant WCCS' permanent custody motion. We disagree.

{¶ 27} When properly objected to, this court reviews a juvenile court's decision to admit or exclude relevant evidence in a permanent custody case for an abuse of discretion. *In re D.R.*, 2025-Ohio-2839, ¶ 19 (10th Dist.). Grandfather, however, did not object to the admissibility of any of the evidence for which he now complains. By failing to object, Grandfather has waived all but plain error on appeal. *In re B.J. & L.J.*, 2016-Ohio-7440, ¶ 61 (12th Dist.). "A finding of plain error is strictly limited, extremely rare, and occurs only in exceptional circumstances." *In re M.G.*, 2023-Ohio-1316, ¶ 34 (12th Dist.). This is because, as this court has noted previously, the plain error doctrine implicates only those errors "that are 'obvious and prejudicial although neither objected to nor affirmatively waived which, if permitted, would have a material adverse [e]ffect on the character and public confidence in judicial proceedings.'" *In re J.M.*, 2019-Ohio-3716, ¶ 14 (12th Dist.), quoting *Schade v. Carnegie Body Co.*, 70 Ohio St.2d 207, 209 (1982).

{¶ 28} Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted in the statement." Evid.R. 801(C). "Hearsay is inadmissible in hearings on motions for permanent custody." *In re M.G.*, 2023-Ohio-1316, at ¶ 35. "However, it is well-established that as the fact-finder, a juvenile court is presumed to have considered only properly admissible evidence unless the record affirmatively demonstrates otherwise." *In re H.D.*, 2017-Ohio-1333, ¶ 8 (12th Dist.). "Therefore, the admission of hearsay evidence in cases involving the termination of parental rights, even if error, is not considered

prejudicial unless it is shown that the judge relied on improper evidence in making his decision." *In re K.B.*, 2014-Ohio-3654, ¶ 83 (12th Dist.). That is to say, the juvenile court's admission of "inadmissible hearsay [evidence] is grounds for reversal only if the juvenile court relied on the evidence to terminate parental rights." *In re W.R.*, 2012-Ohio-382, ¶ 26 (12th Dist.).

**{¶ 29}** As noted above, Grandfather argues the juvenile court admitted and relied upon inadmissible hearsay evidence when making its decision to grant WCCS' permanent custody motion. Grandfather claims the juvenile court's admission of such evidence was "overwhelming," the sheer volume of which should lead this court to make a finding of plain error in this case.

**{¶ 30}** To support this argument, Grandfather directs this court to certain portions of the transcript made of the hearing held on WCCS' motion for permanent custody. This includes a portion of the hearing transcript addressing the way in which G.B.'s parents had supposedly died; Grandfather testifying that G.B.'s mother died as a result of a heart condition while G.B.'s father died of complications from pneumonia, whereas the ongoing caseworker assigned to G.B.'s case, Saunders, testified that it was her belief that both G.B.'s mother and father had died from drug overdoses. This also includes several other portions of the hearing transcript that contain information related to Uncle's illicit drug use and the legal and medical issues that have resulted therefrom. This includes testimony from both Grandfather and Saunders detailing the underlying facts that gave rise to Uncle's conviction for operating a motor vehicle while under the influence drugs and child endangering.

**{¶ 31}** However, while it may be true that the juvenile court referred to some of this evidence within its decision, these references were made primarily within the juvenile

court's recitation of the facts. The juvenile court prefaced its references to this evidence by noting such references were being made "[b]y way of background" only. The juvenile court found this background was important for the reader to know given the court's own initial confusion of the facts in the absence of a basic understanding of "the children services history this family has." Therefore, rather than being offered in evidence to prove the truth of the matter asserted, the evidence for which Grandfather now complains was being offered as necessary background information to provide proper context in which the juvenile court could base its decision on WCCS' motion for permanent custody.

{¶ 32} "Statements are not hearsay if they are not [being] offered to prove the truth of the matter asserted." *In re D.H.*, 2022-Ohio-2780, ¶ 56 (8th Dist.). Such is the case here with respect to the evidence that Grandfather now complains of in this case. Accordingly, given that the complained of evidence was not being offered to prove the truth of the matter asserted, but rather as background information to provide proper context in which the juvenile court could make its decision, the evidence for which Grandfather now complains is not inadmissible hearsay evidence. *See generally State v. Mallory*, 2018-Ohio-1846, ¶ 18 (8th Dist.) ("[a]lthough the rules of evidence prohibit hearsay—an out-of-court statement used to prove the truth of the matter asserted, see Evid.R. 801(C)—the hearsay rule does not ordinarily apply to statements that provide context").

{¶ 33} What is more, upon a simple review of the record, the evidence of which Grandfather now complains was cumulative to the other evidence contained within the record. This includes, among other things, the various investigative social and dispositional summaries and case review documents submitted to the juvenile court for its review by WCCS. This also includes the numerous CASA reports and

recommendations that the CASA had provided to the juvenile court throughout the pendency of this case. This is in addition to the case plan approved by the juvenile court that both Grandparents and Uncle had signed. Therefore, given the record properly before this court, the juvenile court did not err, let alone commit plain error, by admitting into the record the alleged inadmissible hearsay evidence of which Grandfather now complains. *See, e.g., In re M.G.*, 2023-Ohio-1316, at ¶ 35-36 (juvenile court did not err, plain or otherwise, by allowing alleged inadmissible hearsay evidence into the record in a permanent custody case where the complained of evidence "was predominantly, if not wholly, cumulative to the other evidence contained within the record," thereby precluding appellant from demonstrating "how the admission of such evidence subjected him to any resulting prejudice" so as to require the juvenile court's permanent custody decision be reversed). Accordingly, finding no merit to Grandfather's argument raised herein, Grandfather's first assignment of error lacks merit and is overruled.

*Grandfather's Assignment of Error No. 2:*

{¶ 34} THE TRIAL COURT ERRED IN WEIGHING THE BEST INTEREST FACTORS.

{¶ 35} In his second assignment of error, Grandfather argues the juvenile court erred by finding it was in G.B.'s best interest to grant WCCS' motion for permanent custody. Grandfather challenges the juvenile court's best interest finding by arguing that such a finding goes against the manifest weight of the evidence. We disagree.

{¶ 36} A challenge to the manifest weight of the evidence tests the burden of persuasion. *In re A.V.*, 2024-Ohio-1091, ¶ 32 (12th Dist.). Such a challenge requires this court to weigh the evidence and all reasonable inferences and consider the credibility of the witnesses who testified before the juvenile court at the permanent custody hearing.

*In re K.P.*, 2025-Ohio-5060, ¶ 28 (12th Dist.). We must then determine whether, in resolving conflicts in the evidence, if any, the juvenile court clearly lost its way and created such a manifest miscarriage of justice that its judgment granting permanent custody to the agency must be reversed. *In re B.T.*, 2025-Ohio-3019, ¶ 38 (12th Dist.). Should this court make such a determination, "the proper remedy is a remand for a new trial." *In re Z.C.*, 2023-Ohio-4703, ¶ 16. However, "[i]n weighing the evidence, there is a presumption in favor of the findings made by the finder of fact and evidence susceptible to more than one construction will be construed to sustain the verdict and judgment." *In re M.A.*, 2019-Ohio-5367, ¶ 15 (12th Dist.). "We are especially mindful of this in permanent custody cases." *In re M.G.*, 2021-Ohio-1000, ¶ 26 (12th Dist.).

{¶ 37} R.C. 2151.414(B)(1) sets forth the statutory standard for permanent custody applicable to this case. *In re M.H.*, 2022-Ohio-49, ¶ 30 (12th Dist.). That statute provides a two-part permanent custody test. *In re D.D.*, 2024-Ohio-5858, ¶ 22 (12th Dist.). One part of that two-part permanent custody test—the part that Grandfather challenges here—requires the juvenile court to find the grant of permanent custody to be in the child's best interest.[4] *In re J.K.*, 2025-Ohio-3190, ¶ 11 (12th Dist.). This is generally done by utilizing the best-interest factors set forth in R.C. 2151.414(D)(1). *In re S.W.*, 2023-Ohio-118, ¶ 19 (12th Dist.). These factors include, but are not limited to, the interaction and

_____

4. The other part of that two-part test requires the juvenile court to find applicable any one of the circumstances set forth in R.C. 2151.414(B)(1)(a) through (e). *In re K.P.*, 2025-Ohio-5060, ¶ 30 (12th Dist.). "This includes a circumstance, often referred to as the '12 of 22' provision, where the subject child has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period." *In re A.D.*, 2022-Ohio-736, ¶ 20 (12th Dist.), citing R.C. 2151.414(B)(1)(d). This also includes a circumstance, sometimes referred to as the juvenile court's "could not/should not be placed" finding, where the child cannot be placed with either of his parents within a reasonable time or should not be placed with his parents. *In re B.T.*, 2025-Ohio-3019, ¶ 40 (12th Dist.), citing R.C. 2151.414(B)(1)(a). The juvenile court found three of the circumstances outlined in R.C. 2151.414(B)(1)(a) through (e) applied to the case at bar. Grandfather does not challenge any of those three findings. The same holds true for Grandmother. Therefore, for purposes of this opinion, we will focus our attention on what is in dispute. That being, whether it was in G.B.'s best interest for the juvenile court to grant WCCS' motion for permanent custody.

interrelationship of the child with his parents, relatives, and foster caregivers. R.C. 2151.414(D)(1)(a).

{¶ 38} These factors also include the child's wishes, as expressed directly by the child or through the child's guardian ad litem, with due regard for the child's maturity. R.C. 2151.414(D)(1)(b). This is in addition to the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency. R.C. 2151.414(D)(1)(d). These factors, along with whether any of the circumstances listed in R.C. 2151.414(E)(7) through (11) apply with respect to the parents and child, are some of the most commonly used by the juvenile court when determining whether a grant of permanent custody is in a child's best interest. R.C. 2151.414(D)(1)(e). "A juvenile court may also consider any other factors it deems relevant to the child's best interest." *In re R.C.*, 2025-Ohio-5150, ¶ 54 (12th Dist.).

{¶ 39} Grandfather argues the juvenile court "mis-weighed" the best interest factors when deciding to grant WCCS' motion for permanent custody. Grandfather argues the juvenile court should have instead weighed those factors in favor of returning legal custody of G.B. to Grandparents. This is because, according to Grandfather, the evidence "overwhelmingly favored" returning G.B. to Grandparents' legal custody and care. Grandfather argues that this is particularly true in this case when considering the strong bond that G.B. has established with Grandparents. Grandfather also notes that, although G.B. was admittedly doing quite well with his foster family, G.B.'s foster family has indicated their unwillingness to adopt, thereby ensuring that "at some point G.B.'s relationship with his [foster] family will be disrupted and he will be torn from them and placed in yet another home."

{¶ 40} However, while it may be true that G.B. has a tremendous bond with

Grandparents, "this is but one factor to be considered when determining the best interest of a child in a permanent custody proceeding." *In re G.W.*, 2019-Ohio-1586, ¶ 48 (12th Dist.). The same holds true as it relates to G.B.'s foster family's indicated unwillingness to adopt. This is because, as it is now well established, no one factor is to be given "greater weight or heightened significance," nor is any one factor to be considered dispositive when determining what is or is not in a child's best interest. *In re L.D.*, 2025-Ohio-2892, ¶ 119 (12th Dist.).

{¶ 41} Grandfather invites this court to reweigh the evidence and find G.B.'s best interest would be served by returning him to the legal custody and care of Grandparents. We decline Grandfather's invitation for that is not the role of this court. This is because, rather than reweighing the evidence and substituting our own best interest findings for that of the juvenile court, this court must instead give deference to the juvenile court's best interest findings as it relates to the "appropriate weight to be given to the various best interest factors." *In re J.L.C.*, 2023-Ohio-4081, ¶ 51 (12th Dist.). This is because, as it is also now well established, "it is the juvenile court, not this court, that is in the best position to determine the credibility of the witnesses and determine the weight to be given to the evidence." *In re A.V.*, 2024-Ohio-1091, ¶ 36 (12th Dist.).

{¶ 42} The evidence in this case fully supports the juvenile court's decision finding it was in G.B.'s best interest to grant WCCS' motion for permanent custody. This includes the evidence supporting the juvenile court's finding that, "[i]f [G.B.] was to go back to [Grandparents], and [WCCS'] involvement would end, there is no question in the Court's mind that they would reunify [Uncle] with [G.B.]" The juvenile court found this risk to be unacceptable given Grandparents' prior unwillingness and inability to prohibit Uncle from residing in their home with G.B. while Uncle was still using and testing positive for drugs.

This was not error.

{¶ 43} That G.B. may ultimately be removed from his current foster family and placed with a different, adoptive family is of little to no consequence given the evidence indicating that G.B. is thriving now that he is out of the legal custody and care of Grandparents. This includes evidence that G.B. was potty trained within a month after being removed from Grandparents' custody and placed in the care of his foster family. This also includes evidence that G.B.'s schoolwork and reading had improved, his behavioral issues had subsided, his attendance at school had been better, and that all his mental health issues were being addressed now that he is in the care of his foster family rather than Grandparents.

{¶ 44} The juvenile court, just like this court, must act in a manner that places the child's best interest above all else. *In re J.K.*, 2025-Ohio-3190, ¶ 16 (12th Dist.). The juvenile court's decision to grant WCCS' motion for permanent custody does just that. Therefore, finding no merit to Grandfather's challenge to the juvenile court's decision finding it was in G.B.'s best interest to grant WCCS' motion for permanent custody, Grandfather's second assignment of error also lacks merit and is overruled.

**Grandmother's Appeal**

{¶ 45} Grandmother has also appealed the juvenile court's decision to grant permanent custody of G.B. to WCCS. To support her appeal, Grandmother has raised four assignments of error for review. For ease of discussion, we will address Grandmother's third and fourth assignments of error together.

*Grandmother's Assignment of Error No. 1:*

{¶ 46} THE TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY TO THE AGENCY WHEN IT DID NOT MAKE REASONABLE EFFORTS TO UNIFY THIS

FAMILY.

{¶ 47} In her first assignment of error, Grandmother argues the juvenile court erred by finding WCCS had made reasonable efforts to reunify her and Grandfather with G.B. We disagree.

{¶ 48} R.C. 2151.419(A)(1) requires a juvenile court, before it may grant permanent custody of a child to a children's services agency, to determine whether the agency has made reasonable efforts to reunify the child with the child's family. *In re V.R.R.*, 2023-Ohio-185, ¶ 23 (12th Dist.). However, so long as the "reasonable efforts" finding was made by the juvenile court at another, earlier stage in the proceedings, *See In re A.D.*, 2014-Ohio-5083, ¶ 17 (12th Dist.), the juvenile court "does not have to make a reasonable efforts determination pursuant to R.C. 2151.419(A)(1) in a permanent custody hearing." *In re K.K.*, 2017-Ohio-9098, ¶ 55 (12th Dist.), citing *In re C.F.*, 2007-Ohio-1104, ¶ 41. This is because, "'[b]y its terms, R.C. 2151.419 applies only at a hearing held pursuant to R.C. 2151.28, 2151.31(E), 2151.33 or 2151.353.'" *In re Z.B.*, 2024-Ohio-5387, ¶ 38 (12th Dist.), quoting *In re C.F.*

{¶ 49} These provisions involve adjudicatory, emergency, detention, and temporary-disposition hearings, and dispositional hearings for abused, neglected, or dependent children, all of which occur prior to a juvenile court rendering a decision transferring permanent custody of a child to a children's services agency. *In re R.C.*, 2025-Ohio-5150, ¶ 76 (12th Dist.). Therefore, because the juvenile court made a "reasonable efforts" determination at both the adjudicatory and dispositional hearings held in this case, the juvenile court was not required to make another "reasonable efforts" finding at the hearing held on WCCS' motion for permanent custody. Accordingly, because the juvenile court was not required to make a "reasonable efforts" determination at the hearing held

on WCCS' permanent custody motion in this case, Grandmother's argument that the juvenile court erred by finding WCCS had made reasonable efforts to reunify her and Grandfather with G.B. is not relevant to our permanent custody analysis. *In re Z.B.*

{¶ 50} That said, even if we were to find the juvenile court was required to make a "reasonable efforts" determination at the hearing held on WCCS' motion for permanent custody, we would still find no merit to Grandmother's argument challenging the juvenile court's prior "reasonable efforts" determinations. More specifically, we would find no merit in Grandmother's argument that the juvenile court erred by finding WCCS had made reasonable efforts to reunify her and Grandfather with G.B. given that WCCS had failed to "clearly communicate" its case plan requirements to them. This is because, while it may be true that there was some ambiguity as to whether the case plan prohibited Uncle from having any contact with G.B. as opposed to unsupervised contact, the record plainly establishes that Grandparents repeatedly allowed Uncle to reside in their home while he was still using and testing positive for drugs. This holds true for both before and after G.B. was removed from Grandparents' care on September 26, 2024.

{¶ 51} This was in direct conflict with the case plan requirement that expressly prohibited Grandparents from associating with or allowing "known substance abusers" in their home or around G.B. This was also in direct conflict with the one consistent concern expressed by WCCS in that case plan. That being, Grandparents "allowing [Uncle] in the home knowing his substance use history, mental health concerns and lack of compliance with [WCCS]." That Grandparents failed to adhere to WCCS' directive not to permit Uncle to reside in their home does not mean WCCS failed to make reasonable efforts to reunify Grandparents with G.B. To the extent Grandmother claims otherwise, such an argument lacks merit. Therefore, finding no merit to any of the arguments raised by Grandmother

herein, Grandmother's first assignment of error lacks merit and is overruled.

{¶ 52} In so ruling, we take the time to note that, while the children's services agency has the burden of proving that it made reasonable efforts to reunify a child with the child's family, *see In re J.H.*, 2016-Ohio-640, ¶ 29 (12th Dist.), the term "reasonable efforts" is not statutorily defined. *In re M.G.*, 2023-Ohio-1316, at ¶ 39. The term has nevertheless been construed by the Ohio Supreme Court to mean "[t]he state's efforts to resolve the threat to the child before removing the child or to permit the child to return home after the threat is removed." *In re C.F.*, 2007-Ohio-1104, ¶ 28. This necessarily requires the agency to "act diligently and provide services appropriate to the family's need to prevent the child's removal or as a predicate to reunification." *In re L.G.*, 2022-Ohio-529, ¶ 60 (8th Dist.). That is to say, the agency "must use reasonable efforts to help remove the obstacles preventing family reunification." *Id*.

{¶ 53} We also take the time to note that what constitutes "reasonable efforts" does not mean all available efforts. *In re F.S.*, 2021-Ohio-345, ¶ 70 (12th Dist.). "Otherwise, there would always be an argument that one more additional service, no matter how remote, may have made reunification possible." *In re K.B.*, 2015-Ohio-2732, ¶ 50 (12th Dist.). Consequently, "[w]hen examining whether a children services agency made reasonable efforts to reunify a family, the issue is not whether the agency could have done more, but whether it did enough to satisfy the reasonableness standard under the statute." *In re T.P.*, 2016-Ohio-72, ¶ 29 (12th Dist.). "Whether reasonable efforts were made depends on the unique facts and circumstances of each case." *In re E.B.*, 2025-Ohio-1999, ¶ 43 (10th Dist.).

{¶ 54} To that end, what constitutes "reasonable efforts" varies depending upon the nature of a case plan developed for each case. *In re A.B.*, 2022-Ohio-4716, ¶ 18 (12th

Dist.). What does not vary, however, is that the health and safety of the child must remain paramount. *In re S.H.*, 2020-Ohio-3499, ¶ 13 (12th Dist.), citing R.C. 2151.419(A)(1). The record in this case firmly establishes that the juvenile court considered G.B.'s health and safety paramount when deciding whether to grant WCCS' motion for permanent custody. This ultimately resulted in the juvenile court issuing a decision finding that granting WCCS' motion for permanent custody was in G.B.'s best interest. As discussed more fully above, the juvenile court's decision was not made in error. The juvenile court's decision was instead fully supported by the record. Therefore, finding no merit to any of the arguments raised by Grandmother herein, Grandmother's first assignment of error lacks merit and is overruled.

*Grandmother's Assignment of Error No. 2:*

{¶ 55} THE TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY TO THE AGENCY WHEN THE DECISION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND THERE IS INSUFFICIENT EVIDENCE TO SUPPORT THE CONVICTION.

{¶ 56} Like Grandfather, Grandmother in her second assignment of error also argues the juvenile court erred by finding it was in G.B.'s best interest to grant WCCS' motion for permanent custody. However, unlike Grandfather who only challenged the juvenile court's finding as being against the manifest weight of the evidence, Grandmother argues the juvenile court's finding was both against the manifest weight of the evidence *and* not supported by sufficient evidence.

{¶ 57} But, while it may be true that challenges to the manifest weight and sufficiency of the evidence present distinct legal concepts that are both quantitatively and qualitatively different, *In re Z.C.*, 2023-Ohio-4703, at ¶ 13, "a finding that a judgment is

- 22 -

supported by the manifest weight of the evidence necessarily includes a finding that sufficient evidence [also] supports the judgment." *In re E.V.*, 2024-Ohio-192, ¶ 26 (12th Dist.). This holds true even in permanent custody cases such as this. *See In re M.B.*, 2024-Ohio-3239, ¶ 37, 50 (12th Dist.).

{¶ 58} Therefore, given our holding above rejecting Grandfather's challenge to the juvenile court's best-interest finding as being against the manifest weight of the evidence, we also reject Grandmother's challenge to the juvenile court's best-interest finding as not being supported by sufficient evidence. *See e.g., In re B.O.*, 2024-Ohio-1732, ¶ 53 (12th Dist.) ("we find the juvenile court's decision [to grant permanent custody of the subject children to WCCS] is not against the manifest weight of the evidence and is therefore supported by sufficient evidence"). Accordingly, finding no merit to Grandmother's argument raised herein, Grandmother's second assignment of error also lacks merit and is overruled.

*Grandmother's Assignment of Error No. 3:*

{¶ 59} THE TRIAL COURT SHOULD HAVE GRANTED AN EXTENSION TO ALLOW GRANDPARENTS TO DEMONSTRATE WHAT THEY LEARNED IN PARENTING CLASSES.

*Grandmother's Assignment of Error No. 4:*

{¶ 60} THE AWARD OF PERMANENT CUSTODY TO THE STATE DID NOT PROVIDE G.B. WITH A LEGALLY SECURE PLACEMENT.

{¶ 61} In her third assignment of error, Grandmother argues the juvenile court erred by finding it was not in G.B.'s best interest for the court to extend its temporary custody order for an additional six months so that Grandparents could "work toward reunification" by demonstrating what they had learned in their parenting classes on how

- 23 -

to properly manage Uncle. On the other hand, in her fourth assignment of error, Grandmother argues the juvenile court erred by finding it was not in G.B.'s best interest for the court to return legal custody of G.B. to Grandparents. To support this claim, Grandmother notes that WCCS had not placed G.B. with a foster family who was willing adopt him, thereby forcing G.B. to "spend an unknown amount of time with a [foster] family who is not suitable for long term placement [waiting for a family to adopt him] rather than with his [own] family."

{¶ 62} However, as it is now well established, where the granting of permanent custody of a child to a children services agency is in the child's best interest, the granting of legal custody of the child to one of the child's relatives necessarily is not. *In re K.P.*, 2025-Ohio-5060, ¶ 31 (12th Dist.), citing *In re K.C.*, 2024-Ohio-5269, ¶ 37 (5th Dist.) ("[i]f permanent custody to the [a]gency is in the children's best interests, legal custody to a relative necessarily is not"). This would include Grandparents in this case. The same holds true as it relates to the granting of a six-month extension to the juvenile court's temporary custody order. *See In re H.G.*, 2015-Ohio-1764, ¶ 24 (12th Dist.) (noting that "the juvenile court's finding that a grant of permanent custody to [a children services agency] was in [a child's] best interest necessarily implied that an extension of temporary custody was not"); *see also In re T.C.*, 2019-Ohio-3008, ¶ 36 (5th Dist.), citing *In re S.D.*, 2016-Ohio-1493, ¶ 30 (9th Dist.) ("[i]f permanent custody was in the children's best interests, the alternative disposition of extending temporary custody was not").

{¶ 63} Therefore, because the record fully supports the juvenile court's decision finding it was in G.B.'s best interest to grant WCCS' motion for permanent custody, Grandmother's arguments alleging the juvenile court erred by finding it was not in G.B.'s best interest for the court to extend its temporary custody order for an additional six

months lacks merit. The same holds true for Grandmother's arguments alleging the juvenile court erred by finding it was not in G.B.'s best interest for the court to return legal custody of G.B. to Grandparents. That G.B. may have to reside with his foster family for an unknown period before having the opportunity to be adopted does not change this fact. This is because, as stated above, the record plainly establishes that G.B. is thriving now that he is out of Grandparents care. Accordingly, finding no merit to any of the arguments raised by Grandmother herein, Grandmother's third and fourth assignments of error are likewise without merit and overruled.

## Conclusion

{¶ 64} For the reasons outlined above, and having overruled all six assignments of error collectively raised by Grandparents herein, Grandparents' consolidated appeal challenging the juvenile court's decision to grant permanent custody of G.B. to WCCS is denied.

{¶ 65} Judgment affirmed.

BYRNE, P.J., and M. POWELL, J., concur.

# J U D G M E N T   E N T R Y

The assignments of error properly before this court having been ruled upon, it is the order of this court that the judgment or final order appealed from be, and the same hereby is, affirmed.

It is further ordered that a mandate be sent to the Warren County Court of Common Pleas, Juvenile Division, for execution upon this judgment and that a certified copy of this Opinion and Judgment Entry shall constitute the mandate pursuant to App.R. 27.

Costs to be taxed in compliance with App.R. 24.

/s/ Matthew R. Byrne, Presiding Judge

/s/ Robin N. Piper, Judge

/s/ Mike Powell, Judge