[Cite as *In re S.F.*, 2026-Ohio-1502.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

| | | |
|---|---|---|
| IN RE: | : | |
| S.F. | : | CASE NO. CA2025-11-112 |
| | : | <u>OPINION AND</u><br><u>JUDGMENT ENTRY</u><br>4/27/2026 |
| | : | |
| | : | |
| | : | |

APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. 23-D000082

David P. Fornshell, Warren County Prosecuting Attorney, and Kirsten A. Brandt, Assistant Prosecuting Attorney, for appellee, Warren County Children Services.

Brooke L. Logsdon, for appellee, CASA.

Andrew J. Brenner, for appellant.

# **O P I N I O N**

**PIPER, J.**

{¶ 1} Appellant, the paternal grandmother of S.F. ("Grandmother"), appeals the decision of the Warren County Court of Common Pleas, Juvenile Division, granting

permanent custody of her granddaughter, S.F., to appellee, Warren County Children Services ("WCCS"). For the reasons outlined below, we affirm the juvenile court's permanent custody decision.

**Facts and Procedural History**

{¶ 2} The child at issue in this case is S.F., a girl born on July 22, 2014. S.F.'s mother is deceased, due to a drug overdose in 2018. S.F.'s father, who is not part of this appeal, has a long criminal history primarily involving drug offenses. His current location is unknown, but he is believed to be living in Kentucky. In essence, S.F.'s father has abandoned S.F.

{¶ 3} It is undisputed that before this case was initiated, Grandmother was S.F.'s legal custodian, and S.F.'s father earlier had visited with S.F. on the weekends.[1] It is also undisputed that Grandmother, who is 74 years old and a smoker, suffers from chronic stage III kidney disease, congestive heart failure, emphysema, and has potential cancerous nodules on her lungs. The record also indicates that, in 2023, Grandmother exhibited an abnormal mammogram, for which she has not undergone any follow-up care or testing as advised by her primary care physician.[2] Grandmother goes to bed between 7:00 p.m. and 8:00 p.m. every night and gets up at 3:00 a.m. every morning to "clean," do laundry, and "straighten up" her house.

*WCCS's Neglect and Dependency Complaint*

{¶ 4} On September 5, 2023, WCCS filed a complaint alleging that S.F. was a neglected and dependent child. WCCS filed its complaint after it was reported that S.F.,

---

1. S.F. was placed in the legal custody of Grandmother on January 7, 2015, when S.F. was approximately six months old.

2. Grandmother claims that, rather than undergoing more testing to see if she may have cancer, she has "been busy doing other things."

who was then just nine years old, had left Grandmother's home without Grandmother's permission or knowledge at 4:00 a.m. on September 2, 2023. After leaving Grandmother's home, S.F. then wandered the surrounding streets for approximately six hours, until 10:00 a.m., when she was picked up by police. During those six hours, it was reported that S.F., already a victim of prior sexual abuse, met with a 25-year-old man named "Johnny," whom S.F. referred to as her "friend."

{¶ 5}   S.F. was subsequently removed from Grandmother's care and placed in emergency shelter care and temporary custody of WCCS. The juvenile court then approved S.F.'s placement in a qualified residential treatment program. The juvenile court also appointed S.F. with a special advocate and, later, her own attorney. S.F. has since been diagnosed with ADHD, PTSD, Intermittent Explosive Disorder, an adjustment disorder, a defiant disorder, anxiety, and depression. She takes a myriad of prescription medications to help ward off her expressed suicidal ideations and some, albeit infrequent, homicidal ideations.

*Adjudication and Disposition*

{¶ 6}   On November 29, 2023, the juvenile court issued a decision adjudicating S.F. a dependent child. In so doing, the court noted that WCCS had made reasonable efforts and continued to make reasonable efforts toward the possibility of safely returning S.F. to Grandmother's care by providing her and S.F.'s father with supportive services. The record indicates that those supportive services included drug and alcohol evaluations, mental health evaluations, random drug screens, a relative home investigation, and supervised parenting time. S.F.'s father submitted to several drug screens during the pendency of this case, all of which were positive for methamphetamine.

{¶ 7}   On December 13, 2023, the juvenile court issued a dispositional decision

granting WCCS temporary custody of S.F. Following disposition, S.F. was placed in a group home for troubled youth, the location of which changed several times due to S.F.'s increasingly uncontrollable behavior and frequent physical altercations with her housemates. These behaviors included S.F. attempting to jump out of a moving vehicle, S.F. smashing several TVs, and S.F. playing in her own feces then touching group homes' staff, and taunting people with it. These behaviors also included S.F. frequently dumping out the trash cans, ripping the curtains out of the wall, banging her head against a window, and punching holes and writing on the walls. The record indicates that S.F. also exhibited sexualized behaviors. This included one instance where S.F. stripped off all her clothes and began touching herself inappropriately after she pulled back the shower curtain on one of the group home's boys taking a shower.

*WCCS's Motion for Permanent Custody*

{¶ 8}   On September 8, 2025, WCCS filed a motion for permanent custody of S.F. To support its motion, WCCS argued that S.F. requires a "high level of supervision to protect herself and others from her aggressive behavior," for which Grandmother is "limited in her ability to control." WCCS also expressed its belief that Grandmother was incapable of providing S.F. with the care that she needed to achieve and grow into a properly functioning adult. To this, Grandmother disagreed and moved the juvenile court for an order allowing her to regain legal custody of S.F.

{¶ 9}   On October 17, 2025, the juvenile court held a hearing on WCCS's motion for permanent custody. This hearing also addressed Grandmother's competing motion for legal custody. During this hearing, the court heard testimony from four witnesses. This included testimony from a WCCS ongoing supervisor and caseworker formerly assigned to S.F.'s case. This also included testimony from S.F.'s court-appointed special advocate and from Grandmother. Both S.F.'s former caseworker and S.F.'s special advocate

- 4 -

testified that they believed granting WCCS's motion for permanent custody was in S.F.'s best interest.

{¶ 10} The special advocate also testified that she "definitely" had concerns about Grandmother's ability to meet S.F.'s needs. More specifically, as the special advocate testified:

> [I]t's a lot of work taking care of a young child, let alone a child with such significant mental health concerns and negative physical outbursts that [S.F.] has. It would be challenging for anybody to be honest, um, and considering Grandma's age, her health issues that she's dealing with right now…. I worry that somebody's gonna get hurt, um, plus, then, [S.F.] wouldn't be getting what she needs in order to grow and develop and learn better ways of interacting with the world.

{¶ 11} The special advocate testified that this was concerning because:

> I want something better for [S.F.], um, and if Grandmother is not able to acknowledge that something bad happened, and we're gonna learn better ways to help, then how can we help? [Grandmother has] not acknowledged that we could do that at all. Um, so, I, I have, uh, many concerns about Grandmother's ability to, uh, cope, make it through the day, and, then, make a better future for [S.F.].

{¶ 12} Once again, Grandmother disagreed and testified that she believed returning S.F. to her care was in S.F.'s best interest, rather than granting permanent custody of S.F. to WCCS. Grandmother testified that this was "[b]ecause she loves us, and we love her, and she's more comfortable with us." However, when asked, Grandmother (who, despite claiming that her hearing was "pretty good," used headphones to hear the questions being asked of her) testified that she did not know what an IEP was.[3] Grandmother also testified that she did not know all of S.F.'s various diagnoses or what prescription medications that S.F. was taking, stating:

> Yeah, she, she was diagnosed with, uh, uh, uh—what do you

---

3. An IEP, an acronym for Individualized Education Program, is a program that the record indicates S.F. had been on ever since she first began attending school.

call it—uh, A—, AHAD (sic) and, then, uh, and I know some of the medicines she was on. She was on Wellbutrin. She took a hundred milligrams in the morning and a hundred when she came home from school, and she was on some other, uh, antidepressant pills, and, uh…

{¶ 13} Grandmother further testified that, should S.F. ever have one of her outbursts while in her care, "I would try and talk to her first, and see if that would work, and stuff, and then, uh, I would tell her to go to her home, and she always, uh, went to her room." This is in addition to Grandmother testifying that she had obtained alarms to be installed on all the doors and windows in her house so that she would know if S.F. ever tried to leave the house again without her knowledge.

*The Juvenile Court's Permanent Custody Decision*

{¶ 14} On October 21, 2025, the juvenile court issued a detailed 15-page decision granting WCCS's motion for permanent custody and denying Grandmother's competing motion for legal custody. In so doing, the court determined that it was in S.F.'s best interest to grant WCCS's permanent custody motion rather than returning S.F. to the legal custody of Grandmother. The juvenile court reached this decision based upon its finding S.F., "despite all the trauma she has encountered," was doing "as best as can be expected" in her current group home placement, given her "significant mental health problems that require specialized treatment and specialized education" that she receives from an "amazing team" of therapists, school personnel, and psychiatrists "who are involved with her daily."

{¶ 15} The juvenile court also found Grandmother did "not understand the magnitude of [S.F.'s] needs. [Grandmother's] simplistic idea of allowing [S.F.] to live with her and 'she won't act that way anymore' is delusional." This is in addition to the juvenile court finding:

[Grandmother] has neither the stamina, the knowledge, nor

the appreciation of what all is necessary for the daily care of [S.F.]. If [Grandmother] were to regain custody of [S.F.], it is foreseeable that [Grandmother] would be asleep by 8:00 p.m. and not wake up until 3:00 a.m. And, during that time, the doors would be wide open for [S.F.] to run the streets of Franklin like she did back in September 2023. That risk is too great.

The juvenile court thereafter concluded by noting that S.F. "deserves more" and "deserves better," and that "neither of those two involves" Grandmother.

**Grandmother's Appeal**

{¶ 16} On November 19, 2025, Grandmother filed a notice of appeal. Grandmother's appeal was submitted to this court for review on April 8, 2026. Grandmother's appeal is now properly before this court for decision. To support her appeal, Grandmother has raised one assignment of error for review. In this assignment of error, Grandmother argues that the juvenile court erred by finding it was in S.F.'s best interest to grant WCCS's motion for permanent custody. Grandmother argues the juvenile court should have instead found that it was in S.F.'s best interest to grant her motion for legal custody. Grandmother challenges the juvenile court's decision as not being supported by sufficient evidence. Grandmother also challenges the juvenile court's decision as being against the manifest weight of the evidence. We disagree with both of Grandmother's claims.

*Grandmother's Standing to Challenge the Juvenile Court's Decision*

{¶ 17} Grandmother lacks standing to challenge the juvenile court's decision granting WCCS's motion for permanent custody. *In re J.P.R.*, 2024-Ohio-3380, ¶ 20 (4th Dist.). That is, she lacks standing to the extent of challenging the fact that such a decision terminated S.F.'s father's parental rights over S.F. *In re E.E.D.*, 2022-Ohio-4014, ¶ 49 (8th Dist.). This is because, as noted by the Ohio Supreme Court, "[t]he law does not provide grandparents with inherent legal rights based simply on the family relationship."

*In re H.W.*, 2007-Ohio-2879, ¶ 9. Grandmother's standing to challenge the juvenile court's permanent custody decision is instead limited to the impact that decision had on her motion for legal custody and the termination of her rights as S.F.'s legal custodian. *See, e.g., In re Travis Children*, 80 Ohio App.3d 620, 625-626 (5th Dist.1992) (grandmother had standing to challenge a juvenile court's permanent custody decision to the extent that such a decision denied her motion for legal custody).

{¶ 18} "[T]he question of whether a legal custody placement is appropriate essentially invokes consideration of the same factors as a determination of the best interest of the child for purposes of a permanent custody decision." *In re S.S.*, 2007-Ohio-7046, ¶ 13 (9th Dist.). Consequently, when reviewing such a decision, this court typically conducts just "a single 'best interest' review of the [juvenile] court's decision to place the child in the permanent custody of the agency rather than in the legal custody [of] a relative." *In re K.M.*, 2014-Ohio-4268, ¶ 9 (9th Dist.); *see, e.g., In re G.B.*, 2025-Ohio-5803, ¶ 62-63 (12th Dist.). This is because, "where the granting of permanent custody of a child to a children services agency is in the child's best interest, the granting of legal custody of the child to one of the child's relatives necessarily is not." *In re K.P.*, 2025-Ohio-5060, ¶ 31 (12th Dist.), citing *In re K.C.*, 2024-Ohio-5269, ¶ 37 (5th Dist.).

*Challenges to the Sufficiency and Manifest Weight of the Evidence*

{¶ 19} Challenges to the sufficiency and manifest weight of the evidence involve separate and distinct legal concepts. *In re Z.C.*, 2023-Ohio-4703, ¶ 13. A challenge to the sufficiency of the evidence tests the burden of production. *In re K.P.* at ¶ 28. On the other hand, a challenge to the manifest weight of the evidence tests the burden of persuasion. *In re A.V.*, 2024-Ohio-1091, ¶ 32 (12th Dist.). However, although they present separate and distinct legal concepts, it is well established that "a finding that a judgment is supported by the manifest weight of the evidence necessarily includes a finding that

sufficient evidence [also] supports the judgment." *In re E.V.*, 2024-Ohio-192, ¶ 26 (12th Dist.). "This holds true even in permanent custody cases such as this." *In re G.B.*, 2025-Ohio-5803, at ¶ 57 (12th Dist.).

{¶ 20} Given the above principles, and in the interests of judicial efficiency, we will begin our analysis by determining whether the juvenile court's decision to grant WCCS's motion for permanent custody was against the manifest weight of the evidence. If we find that the juvenile court's permanent custody decision was not against the manifest weight of the evidence, this court will then be absolved of the need to make a separate determination of the sufficiency of the evidence. *See, e.g., In re B.O.*, 2024-Ohio-1732, ¶ 53 (12th Dist.) ("we find the juvenile court's decision [to grant permanent custody of the subject children to WCCS] is not against the manifest weight of the evidence and is therefore supported by sufficient evidence").

*Manifest Weight of the Evidence Standard of Review*

{¶ 21} A challenge to the manifest weight of the evidence requires this court to weigh the evidence and all reasonable inferences and consider the credibility of the witnesses who testified before the juvenile court at the permanent custody hearing. *In re K.P.*, 2025-Ohio-5060, at ¶ 28 (12th Dist.). We must then determine whether, in resolving conflicts in the evidence, if any, the juvenile court clearly lost its way and created a manifest miscarriage of justice warranting reversal of the judgment granting permanent custody to the agency. *In re B.T.*, 2025-Ohio-3019, ¶ 38 (12th Dist.). Should this court make such a determination, "the proper remedy is a remand for a new trial." *In re Z.C.*, 2023-Ohio-4703, at ¶ 16. However, "[i]n weighing the evidence, there is a presumption in favor of the findings made by the finder of fact and evidence susceptible to more than one construction will be construed to sustain the verdict and judgment." *In re M.A.*, 2019-Ohio-5367, ¶ 15 (12th Dist.). "We are especially mindful of this in permanent custody cases."

*In re M.G.*, 2021-Ohio-1000, ¶ 26 (12th Dist.).

*The Two-Part Permanent Custody Test*

{¶ 22} R.C. 2151.414(B)(1) sets the legal standard for permanent custody in this case. *In re M.H.*, 2022-Ohio-49, ¶ 30 (12th Dist.). That statute provides a two-part test for determining whether to grant permanent custody. *In re D.D.*, 2024-Ohio-5858, ¶ 22 (12th Dist.). One part of this test—the part that Grandmother challenges here—requires the juvenile court to find that granting permanent custody is in the child's best interest.[4] *In re J.K.*, 2025-Ohio-3190, ¶ 11 (12th Dist.). This is usually determined by considering the best-interest factors listed in R.C. 2151.414(D)(1). *In re S.W.*, 2023-Ohio-118, ¶ 19 (12th Dist.). These factors include the child's interactions and relationships with her parents and relatives. R.C. 2151.414(D)(1)(a). They also include the child's wishes and the child's need for a legally secure permanent placement. R.C. 2151.414(D)(1)(b) and (d). These are some of the most common factors that the juvenile court considers when determining whether it is in a child's best interest to grant a children's services agency's motion for permanent custody. *In re G.B.*, 2025-Ohio-5803, at ¶ 37 (12th Dist.). They are not the only factors that the court may consider, however. "A juvenile court may also consider any other factors it deems relevant to the child's best interest." *In re R.C.*, 2025-Ohio-5150, ¶ 54 (12th Dist.).

*Grandmother's Arguments and Analysis*

{¶ 23} Grandmother argues that the juvenile court erred by finding it was in S.F.'s

---

4. The other part of that two-part test requires the juvenile court to find that any one of the circumstances listed in R.C. 2151.414(B)(1)(a) through (e) applies. *In re K.P.*, 2025-Ohio-5060, ¶ 30 (12th Dist.). "This includes a circumstance, often referred to as the '12 of 22' provision, where the subject child has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period." *In re A.D.*, 2022-Ohio-736, ¶ 20 (12th Dist.), citing R.C. 2151.414(B)(1)(d). When making this determination, "the relevant time period to consider is the 22 months prior to the date the permanent custody motion was filed." *In re L.D.*, 2025-Ohio-2892, ¶ 107 (12th Dist.), citing *In re C.W.*, 2004-Ohio-6411, ¶ 26. The juvenile court in this case found S.F. had been in the temporary custody of WCCS for the required time period necessary to establish a "12 of 22" finding. Grandmother does not contest the juvenile court's "12 of 22" finding.

best interest to grant WCCS's motion for permanent custody. This is because, according to Grandmother, "many" of the best-interest factors set forth in R.C. 2151.414(D)(1) weighed in her favor.

{¶ 24} To support this claim, Grandmother notes that she worked "very hard" to complete her case plan services, "all of which had been or were close to being completed at the time of the hearing." Grandmother also notes that she has an "appropriate" home for S.F., with her own room, where S.F.'s younger brother would reside as well. Grandmother further claims that she has the financial means to support S.F., that she and S.F. are bonded, and that S.F. has expressed a desire to return to her care. This is in addition to Grandmother arguing that WCCS's decision to place S.F. in a group home several hours away, which required her to halt her parent coaching classes, "belies" the juvenile court's "erroneous conclusion" that she could not meet S.F.'s needs. Grandmother finally argues that, in addition to the services and support that she had already received from WCCS, she should have been provided with even "more support" to ensure that S.F. would ultimately be returned to her custody.

{¶ 25} Upon review and careful consideration of Grandmother's arguments, we find no error in the juvenile court's decision to grant WCCS's motion for permanent custody. Specifically, we find no error in the juvenile court's determination that it was in S.F.'s best interest to grant WCCS's permanent custody motion rather than Grandmother's competing motion for legal custody. That S.F. and Grandmother share a loving bond does not change this fact, for this is but one factor to be considered when determining the best interest of a child in a permanent custody proceeding. *In re G.W.*, 2019-Ohio-1586, ¶ 48 (12th Dist.). Nor does the fact that Grandmother completed nearly all of her required case plan services change this fact. *In re D.L.*, 2026-Ohio-295, ¶ 42 (5th Dist.). This is because, as is now well established, "a case plan is a means to an end,

and not an end itself." *In re L.T.*, 2016-Ohio-5272, ¶ 38 (12th Dist.).

{¶ 26} That is not to downplay the love that S.F. feels toward Grandmother and vice versa. But the record in this case plainly establishes that S.F. needs more than Grandmother can provide—something greater than just a roof over her head, food to eat, and clothes to wear. What S.F. needs is a legally secure permanent placement that is both willing and able to provide her with the specialized care and dedicated attention that is required to address her severe behavioral problems and significant mental health issues. *See In re C.M.*, 2026-Ohio-696, at ¶ 49 (12th Dist.). That is, a permanent placement that encompasses both material and emotional stability, fostering growth, stability, and security. *In re M.B.*, 2024-Ohio-3239, ¶ 50 (12th Dist.). The record indicates that Grandmother is neither willing nor able to provide S.F. with such a legally secure permanent placement.

{¶ 27} As noted above, the juvenile court determined that Grandmother lacked the stamina, knowledge, and appreciation of what was necessary to properly care for S.F., including the various appointments that S.F. would need to attend and the multitude of prescription medications that she would need to take. We agree. We also agree with the juvenile court's finding that, if Grandmother were to regain custody of S.F., it is foreseeable that Grandmother would be asleep by 8:00 p.m. and not wake back up until 3:00 a.m., during which time the doors to her house would be "wide open" for S.F. to abscond and "run the streets of Franklin like she did back in September 2023. That risk is too great."

{¶ 28} "[A] child's life is not a gamble." *In re K.W.*, 2018-Ohio-1933, ¶ 91 (4th Dist.). That is to say, "the law does not require the court to experiment with a child's welfare to see if the child will suffer great detriment or harm." *In re B.C.*, 2018-Ohio-2673, ¶ 30 (12th Dist.). This holds true no matter how good the odds may seem. *In re C.M.*, 2026-Ohio-

696, ¶ 51 (12th Dist.). The juvenile court must instead act in a manner that places the child's best interests above all else. *In re J.K.*, 2025-Ohio-3190, at ¶ 16 (12th Dist.). The same holds true for this court on appeal. *In re D.D.*, 2024-Ohio-5858, at ¶ 25 (12th Dist.).

{¶ 29} Given the record in this case, the juvenile court's decision to grant WCCS's motion for permanent custody was proper and without error: it places S.F.'s best interests at the forefront of these proceedings rather than focusing on what Grandmother wants or what Grandmother herself believes is in S.F.'s best interest. *See, e.g., In re G.B.*, 2025-Ohio-5803, at ¶ 44 (12th Dist.) (affirming a juvenile court's decision granting a children's service agency's permanent custody motion rather than grandparents' competing motion for legal custody where the grant of permanent custody was in the child's best interest). Therefore, because the juvenile court's permanent custody decision aligns with the manifest weight of the evidence, there is also sufficient evidence in the record to support the decision. Accordingly, finding no error, we overrule Grandmother's single assignment of error.

## Conclusion

{¶ 30} The juvenile court did not err by finding it was in S.F.'s best interest to grant WCCS's motion for permanent custody rather than Grandmother's competing motion for legal custody. Therefore, finding no error in the juvenile court's decision, Grandmother's appeal challenging the juvenile court's permanent custody decision is denied.

{¶ 31} Judgment affirmed.

BYRNE, P.J., and M. POWELL, J., concur.

## J U D G M E N T   E N T R Y

The assignment of error properly before this court having been ruled upon, it is the order of this court that the judgment or final order appealed from be, and the same hereby is affirmed.

It is further ordered that a mandate be sent to the Warren County Court of Common Pleas for execution upon this judgment and that a certified copy of this Opinion and Judgment Entry shall constitute the mandate pursuant to App.R. 27.

Costs to be taxed in compliance with App.R. 24.

_____
*/s/ Matthew R. Byrne, Presiding Judge*


_____
*/s/ Robin N. Piper, Judge*


_____
*/s/ Mike Powell, Judge*