[Cite as *Hosler v. Hosler*, 2018-Ohio-4486.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY


BRYAN K. HOSLER,                          :

    Plaintiff-Appellant,              :          CASE NO. CA2017-10-052

                                   :          O P I N I O N
    - vs -                                                          11/5/2018

                                     :

SUANN C. HOSLER,                          :

    Defendant-Appellee.               :


APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
DOMESTIC RELATIONS DIVISION
Case No. 2014DRB00511


Anthony W. Greco, Aaron E. Kenter, Joseph S. Jeziorowski, 6810 Caine Road, Columbus, Ohio 43235, for plaintiff-appellant

Suann C. Hosler, 9825 Orchard Club Drive, Cincinnati, Ohio 45242, defendant-appellee, pro se


**PIPER, J.**

{¶ 1} Plaintiff-appellant, Bryan Hosler, appeals a decision of the Clermont County Court of Common Pleas, Domestic Relations Division, denying his motion to terminate spousal support of defendant-appellee, Suann Hosler.

{¶ 2} The parties were married in 1980, separated in 2012, and Bryan filed for divorce in 2014. Before the divorce was finalized, Suann began a romantic relationship with

Dan Schroeder, who she met on an airplane. Dan lived in Lima, Ohio, approximately two hours from Suann, who resided in the Cincinnati area.

{¶ 3} Suann began traveling to Lima to visit Dan, and also began working for a business owned by Dan's mother, Jean Schroeder Properties. Suann managed rental properties owned by the business, performed administrative tasks, and helped to prepare units for future rental. At first, Suann worked in Lima during the week and traveled back to the Cincinnati area where she maintained the marital residence she once shared with Bryan. However, Suann soon began living in Dan's home in Lima and rarely returned to the Cincinnati area for more than a few hours at a time. Dan, who traveled for work, rented a home in Toledo, and traveled between Toledo and Lima to be with Suann when he was not working.

{¶ 4} In 2015, the trial court issued the final divorce decree and ordered Bryan to pay Suann spousal support until either party died, Suann remarried, or Suann cohabitated with another. In 2017, Bryan moved the trial court to terminate the support order based on Suann's cohabitation with Dan. The trial court held a hearing over five days, after which it denied Bryan's motion. Bryan now appeals the trial court's decision denying his motion to terminate spousal support, raising the following assignments of error.

{¶ 5} Assignment of Error No. 1:

{¶ 6} THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION TO THE MATERIAL PREJUDICE OF PLAINTIFF-APPELLANT IN DENYING HIS MOTION TO TERMINATE SPOUSAL SUPPORT DUE TO DEFENDANT-APPELLEE'S COHABITATION WITH HER PARAMOUR.

{¶ 7} Bryan argues in his first assignment of error that the trial court erred by denying his motion to terminate spousal support because of Suann's cohabitation with Dan.

{¶ 8} Within the context of a divorce decree, "cohabitation" contemplates a

relationship that is the functional equivalent of a marriage. *Fox v. Fox*, 12th Dist. Clermont No. CA2013-08-066, 2014-Ohio-1887, ¶ 27. In determining whether cohabitation exists, courts consider three principal factors: "(1) an actual living together; (2) of a sustained duration; and (3) with shared expenses with respect to financing and day-to-day incidental expenses." *Keith v. Keith*, 12th Dist. Butler No. CA2010-12-335, 2011-Ohio-6532, ¶ 11. Thus, cohabitation "requires not only a relationship, sexual or otherwise, of a permanent, continuing nature, but also some sort of monetary support between the spouse and the paramour * * *." *Cravens v. Cravens*, 12th Dist. Warren No. CA2008-02-033, 2009-Ohio-1733, ¶ 10.

{¶ 9} Whether a particular relationship or living arrangement constitutes cohabitation is a question of fact determined by the trial court on a case-by-case basis. *Burns v. Burns*, 12th Dist. Warren No. CA2011-05-050, 2012-Ohio-2850, ¶ 10. Consequently, an appellate court will not overturn a trial court's finding regarding cohabitation so long as it is supported by some competent, credible evidence. *Fox*, 2014-Ohio-1887. A trial court has the best opportunity to observe the demeanor and assess the credibility of each witness. *Cravens*, 2009-Ohio-1733 at ¶ 11. However, proof of cohabitation "does not have to be by direct evidence alone, but can be established by circumstantial evidence." *Foster v. Foster*, 10th Dist. Franklin No. 15AP-1157, 2017-Ohio-4311, ¶ 42.

{¶ 10} While we are respectful of the trial court's role in determining the credibility of the witnesses, we find the trial court's determination unsupported by competent and credible evidence that Suann was not cohabitating with Dan. Instead, and as demonstrated by uncontested evidence, including Suann and Dan's own testimony, the record is replete with evidence that substantiates cohabitation.

**Factors One and Two: Actual Living Together for a Sustained Duration**

{¶ 11} Regarding the first and second factors for consideration, an actual living

together for a sustained duration, the record demonstrates that Suann and Dan have shared a home and have maintained an ongoing relationship that is the functional equivalent to a marriage.

{¶ 12} Despite Suann's continual contention at the hearing that she was merely Dan's "friend," Suann later admitted that she had been in a "romantic relationship" with Dan since 2014. That year, she and Dan went on a vacation together to a timeshare property that she and Bryan purchased during their marriage, which was later awarded to her in the divorce. Dan and Suann also exchange gifts with one another, including at Valentine's Day, and Suann gave Dan's son gifts as well. Both Suann and Dan testified that they engaged in sexual relations with one another, and neither denied the sexual nature of their ongoing relationship.

{¶ 13} In addition to physical intimacy, Suann also testified that she and Dan sought advice from one another and supported each other emotionally during difficult times. Suann and Dan's phone records established that the two often spoke on the phone with each other for two to three hours a day, and exchanged hundreds of text messages each month.[1] The duration and frequency of the phone calls increased when Dan was working in Toledo, or Suann was in the Cincinnati area and the two spent their day apart. The duration and frequency of the conversations also increased when Suann was in court or tending to issues with Bryan and the divorce. Neither Suann nor Dan denied their shared physical and emotional intimacy, thus clearly establishing consortium.

{¶ 14} The record also demonstrates that Suann physically lived in Dan's home. It is uncontested that Dan gave Suann a garage door opener and that Suann could enter Dan's

---

1. The record indicates that once cohabitation became an issue, Suann began spending most of her time at the marital residence in Cincinnati. During this time, she and Dan spoke on the phone for multiple hours each day, one day exceeding six hours, and exchanged a multitude of text messages.

home at will. Suann claimed during her testimony that she only lived in Dan's home because of her employment with Jean Schroeder Properties. However, Suann admitted that she stayed with Dan at his home even when she was not working so that she could spend time with him. Moreover, the phone records established Suann's continued presence in Lima after she ended her employment with Jean Schroeder Properties.

{¶ 15} Further demonstrating the gratuitous shared living arrangements, Dan testified that he never entered a formal agreement with Suann to establish that her living in his house was connected to her employment with his mother's company. It is undisputed that Dan never attached an economic value to Suann living in his home, such as deducting rent from her paychecks or the like. In fact, Dan testified that he did not charge Suann rent and that she did not pay utilities despite her staying at his home continually and for extended periods of time each month.

{¶ 16} Throughout her testimony, Suann maintained that she never moved from the marital residence and therefore never lived with Dan. Despite her claim that she was always a resident of the Cincinnati area, Suann testified that she brought her dog with her to Lima, patronized the nail salon there, booked appointments with a Lima dermatologist, had her car serviced and maintained there, and had her packages from online purchases delivered to Dan's home in Lima. Suann also received medical treatment from the hospital in Lima, and had her prescriptions filled at a pharmacy there. Dan often mailed Suann checks to his house, and Dan testified that he sent the checks to Suann in Lima so that she would receive them in a timely manner rather than the checks sitting unclaimed for days in the mailbox of Suann's Cincinnati marital residence.

{¶ 17} Suann's phone records also establish that she spent most of her time in Lima, including a stretch of 28 days one month. Suann also spent all 31 days of October 2015 in Lima, returning to the marital residence in Cincinnati for only a few hours that month. During

that time, Dan was in Lima 23 of the 31 days, spending time at his home with Suann.

{¶ 18}  In addition to the number of days she was in Lima as opposed to Cincinnati, Suann's testimony revealed the ongoing marital nature of her relationship with Dan and the many ways they acted as spouses.  For example, Suann was involved with Dan's family and the two attended family events as a pair.  Dan testified that Suann accompanied him to visit his family in Buffalo, and that the two spent a day at Niagara Falls together as part of the trip.  Suann also admitted that she would stay in Lima to attend Dan's "family event[s]" with him, even when she was not working, and that she went with Dan to "parties with family."

{¶ 19}  The record also demonstrates the many ways that Suann shared a relationship with Dan's son, including that she would attend family events specifically at the son's request.  Dan also testified that Suann was present in his home when his son had visitation with him, and that Suann spent time with his son by taking him for ice cream and the like.  Suann also took Dan's son to a meeting by herself regarding a school trip, and the documents relating to the trip refer to Suann as the son's "stepmom."  As discussed in more detail below, Suann registered the son for the trip, paid the trip deposit, and allowed her credit card to be used for multiple automatic payments for the trip.

{¶ 20}  Also demonstrating a closeness akin to spouses, Suann testified to her intimate knowledge of Dan's eating and drinking habits, such as that Dan does not eat breakfast and refuses to eat fruits and vegetables.  Suann also testified that Dan enjoys canned food, bratwurst, and bacon, and that she would sometimes take bites from the food that Dan was eating.  Suann also testified to Dan's enjoyment of beer, and the various brands he drank.

{¶ 21}  Moreover, Suann performed domestic duties in the home she and Dan shared, including watering the plants, vacuuming, and grilling food for Dan.  Dan also testified that Suann ran errands for him, such as picking up his dry cleaning.

**{¶ 22}** A private investigator testified that he went to Dan's home in Lima approximately ten times within three months and saw Suann's vehicle there multiple times, once parked in Dan's garage. The investigator also observed Dan and Suann speaking to a contractor outside Dan's home, during which time Suann was wearing house slippers, thus intimating her comfort and familiarity as a member of Dan's household.

**{¶ 23}** These facts, which were uncontested or established from Dan and Suann's own testimony, establish an actual living together of a sustained duration sufficient to prove the first and second factors of the cohabitation standard.

### Factor Three: Monetary Support and Shared Finances

**{¶ 24}** Specific to the third factor, which requires shared finances and monetary support, the record establishes that Dan supported Suann and that the two shared finances. The competent and credible evidence, which was undisputed or taken directly from Suann and Dan's testimony, establishes the necessary shared expenses thus demonstrating that the two lived as a functional equivalent of husband and wife.

**{¶ 25}** Dan supported Suann monetarily in several ways. First, the record is undisputed that Suann lived in Dan's home rent free and that the two did not have an agreement wherein Suann experienced any financial detriment to live in the home. Suann also received money from Dan through cash transfers, checks, and direct deposit into her checking account.

**{¶ 26}** To combat this undisputed evidence, Suann and Dan testified that Dan only gave Suann money as income from working for Jean's business, or as reimbursement for an expense Suann incurred on behalf of Dan or his son. However, Dan and Suannn's own testimony discredits this assertion.

**{¶ 27}** Regarding Suann's claim that money she received from Dan was income, the record is undisputed that Jean's business did not provide Suann with any financial

documentation for tax purposes.[2] Dan testified that he did not keep records showing what or why payments were made to Suann, nor did Dan have a record of what work Suann completed. Despite confirming that the other contractors who worked for the business provided invoices, Dan testified that Suann never presented the company with invoices or an itemized listing of what work she performed. Nor was she expected to. Dan further admitted during his testimony that he did not know how many hours a week Suann worked. Nor could he document Suann's hourly wage, or even if she earned minimum wage for the work she did for his mother's company.

{¶ 28} Dan also testified that Suann did not fill an open position when she first began working for the business, and that Suann was not hired to perform the work of any past employee. Dan admitted during his testimony that he paid Suann less money than he paid other workers for doing the same or similar jobs, and further testified that he did not have a pre-determined way to calculate Suann's pay for any given task. Instead, Dan testified that he paid Suann what he thought was "fair" for completing a job. Dan also admitted that on occasion, he took money out of his personal account to give to Suann rather than paying her from Jean's business account.

{¶ 29} Suann testified that she ended her employment in November 2015, and that any money received from Dan after that date was reimbursement for something she bought for Dan or his son. The record shows Suann accepted money from Dan after the date she claimed her employment ended. While the later payments may have been reimbursement, Suann nonetheless initially used her funds to benefit Dan or his son by procuring for them necessary or desired items. Given that Suann did not charge Dan or his

---

2. The record indicates that at the time of the hearings, Jean was suffering from late-stage dementia and was not called as a witness because of her illness. The record also indicates that Dan oversaw his mother's affairs as her power of attorney. Thus, all payments received by Suann from his mother's business were at Dan's directive.

son a fee for assisting them in this manner, Suann offered gratuitous services for Dan and his son, as any person who shared a close relationship would.

{¶ 30} Despite her alleged financial struggles, and since ending her employment with Jean's business, Suann did not obtain other employment. Instead, the record indicates that Dan assisted Suann with her day-to-day incidental expenses. For example, Suann admitted to enjoying the use of utilities while at Dan's home, such as water, temperature control, and electricity, even though Dan paid these bills. Dan also testified that he paid for Suann's gas on occasion, filling the tank after he used her vehicle. Suann also testified that Dan paid her Goodyear bill, which accrued when her vehicle needed repairs.

{¶ 31} Dan also testified that he shared his groceries with Suann, and Suann confirmed that she was permitted to eat anything from Dan's home. Despite testifying that she bought her own groceries because her tastes were different from Dan, Suann's bank records establish that she did not purchase groceries for the months she spent in Lima, while Dan's bank records indicate that he continually bought groceries for the home. Dan providing these types of financial provisions on a day-to-day basis to an unemployed Suann is additional indicia of monetary support.

{¶ 32} Specific to shared finances, Suann admitted on cross-examination that she added Dan and his son to her cellular phone plan, and that she bought a phone for Dan's son. Suann confirmed that she paid the phone bill, and that no one ever paid it on her behalf even when Dan and his son were on her account. While Dan testified that he reimbursed Suann for paying his share of the phone bill, the financial statements and bank account records did not establish that such reimbursement occurred consistently. Suann also purchased items for parties at Dan's home, such as hamburgers and hot dogs, and her bank records show that she spent $250 in one month at a liquor store despite her testimony that she only drinks one glass of wine a day.

{¶ 33} It is also undisputed that Suann was heavily involved in helping Dan's son participate in a school trip to Europe, including the fact that she made multiple payments toward the trip's total cost. Suann testified that she, not Dan, made the necessary arrangements for the son to participate in the trip, such as paying the initial deposit and completing necessary forms. Dan confirmed during his testimony that Suann took his son to the meeting where the trip was discussed, completed the registration form for his son to participate, and paid the necessary deposit. Dan further confirmed that he did not attend the trip meeting so that Suann had complete responsibility in initiating his son's participation. While Suann and Dan testified that Suann was reimbursed for the payments she made toward the trip, the fact remains that Suann registered Dan's son for the trip, took him to the meeting, placed the deposit, and made multiple payments on her credit card. Without Suann's involvement, Dan's son would not have been permitted to attend the trip.

{¶ 34} The record also clearly demonstrates that Dan was well-aware of Suann's financial situation and that Suann shared details of her finances with Dan. For example, Dan testified that he was concerned with how much money Suann was spending on the post-divorce proceedings, including what amount of money Suann was paying in attorney fees. Dan also verified his knowledge of what Bryan was ordered to pay Suann in spousal support, and testified that Suann shared with him how much financial stress she incurred because of the divorce.

{¶ 35} In sum, Suann lived with Dan rent-free and received the benefits of utilities and groceries without paying for them. She also received money directly from Dan and used her own finances to contribute to Dan's parties and procure benefits for Dan or his son. These facts establish the necessary monetary support and shared finances.

**Credibility and the Trial Court's Ultimate Determination**

{¶ 36} While we are mindful and respectful of the trial court's ability to assess

credibility and its role in determining post-divorce issues, we cannot affirm its ultimate decision unless such is supported by competent, credible evidence. The record in this matter, however, does not support the trial court's determination that cohabitation was lacking.

{¶ 37} To combat Bryan's evidence of cohabitation, Suann repeatedly denied living with Dan and accepting his money for any reason other than her work with Jean Schroeder Properties or as reimbursement. However, the record establishes that Suann lacked credibility at times, and that her testimony was often unreliable. For example, Suann admitted during her testimony that she may have perjured herself in the past regarding her relationship status.[3] Moreover, the trial court expressly recognized that Suann made misrepresentations, and further determined that Suann was "very evasive" during her testimony as to whether she was in a relationship. Later during the hearing, the trial court told Bryan's counsel, "I understand you have some difficulty believing her, I do as well * * *."

{¶ 38} While the trial court may have determined that Suann was credible *enough* to successfully defend Bryan's allegation of cohabitation, the competent and credible evidence established cohabitation because it showed that Dan and Suann lived together for a sustained duration and shared expenses with respect to financing and day-to-day incidental expenses.

{¶ 39} Our review of the record, including five days of trial testimony, reflects that Dan and Suann's lifestyle amounted to cohabitation as a matter of law. Suann lived with Dan, and Dan provided groceries, paid for utilities, and gave Suann money despite being unable to document or explain why the payments were made. Suann's assertions often lacked

---

3. The record indicates that Suann denied being in a relationship during the divorce proceedings, including while testifying at a hearing that occurred during the proceedings, but later admitted that her relationship with Dan started in 2014, before the trial court issued the final divorce decree.

supporting evidence that Dan gave her money only as reimbursements or income from working for Jean's business.

{¶ 40} Suann's continued ownership of the marital residence and her spending a limited amount of time there does not overcome the overwhelming evidence demonstrating cohabitation. Thus, the totality of the evidence presented reflects that Suann and Dan were physically living together, for a sustained duration, and with shared expenses with respect to finances and day-to-day incidental expenses. No other result is supported by the record, and the trial court abused its discretion in finding otherwise.

### Termination Date

{¶ 41} Generally, the exact date cohabitation begins cannot be determined with any degree of certainty because cohabitation implies a course of conduct existing over a period of time. *Thomas v. Thomas*, 76 Ohio App.3d 482, 487-488 (10th Dist.1991). As such, the exact date of cohabitation is much more difficult to pinpoint than it is for other events, such as marriage or divorce. *Id.*

{¶ 42} While Bryan was able to establish Suann's cohabitation as a matter of law, the record does not establish a specific date upon which her cohabitation began.[4] Given Suann's position that she did not cohabitate, she did not advocate a possible termination date. Bryan waited until February 2017 to file his motion to terminate spousal support, and did not specify a date for the trial court to use for termination orders other than suggesting that Suann's cohabitation started before the decree was finalized.[5] Therefore, neither party

---

4. According to App.R. 12(B), "When the court of appeals determines that the trial court committed error prejudicial to the appellant and that the appellant is entitled to have judgment * * * rendered in his favor as a matter of law, the court of appeals shall reverse the judgment * * * of the trial court and render the judgment * * * that the trial court should have rendered * * *." The trial court should have found cohabitation and ordered a termination date for Bryan's spousal support. Thus, and according to App.R. 12(B) this court has authority to render judgment in favor of Bryan, as well as order the termination date, as the trial court should have done.

5. If Bryan believed that Suann's cohabitation began as early as 2014, he should not have waited until 2017 to file a motion to terminate his spousal support. *See Dyrdek v. Dyrdek*, 4th Dist. Washington No. 09CA29, 2010-

has suggested a viable termination date, and none is otherwise established definitively in the record. As such, the date Bryan filed his motion to terminate spousal support, February 14, 2017, will constitute the termination date of Bryan's spousal support order.

{¶ 43} Given our determination that the trial court's decision was not supported by competent, credible evidence, Bryan's first assignment of error is sustained. On remand, the trial court shall make all necessary orders regarding the termination and resulting entitlements of both parties, if any.

{¶ 44} Assignment of Error No. 2:

{¶ 45} THE TRIAL COURT ERRED TO THE MATERIAL PREJUDICE OF PLAINTIFF-APPELLANT IN EXCLUDING RELEVANT EVIDENCE.

{¶ 46} Bryan argues in his second assignment of error that the trial court erred in excluding several of his exhibits. However, given our decision that Bryan was able to prove cohabitation without reference to the excluded evidence, we find this assignment of error moot.

{¶ 47} Judgment reversed, and the cause is remanded.

M. POWELL, J., concurs.

RINGLAND, J., dissents.

**RINGLAND, J., dissenting.**

{¶ 47} I respectfully dissent from the majority's decision in resolution of the first assignment of error. The determination of whether a particular relationship or living arrangement constitutes cohabitation is determined on a case-by-case basis by the trial court

---

Ohio-2329, ¶ 18 (recognizing the possible application of the doctrine of laches to the termination date of spousal support based on cohabitation and defining laches as "an omission to assert a right for an unreasonable and unexplained length of time, under circumstances prejudicial to the adverse party").

as the trier of fact. *Burns v. Burns*, 12th Dist. Warren No. CA2011-05-050, 2012-Ohio-2850, ¶ 10. In past cases, this court would not overturn a trial court's finding with regard to cohabitation as long as it was supported by some competent, credible evidence. *Moore v. Moore*, 12th Dist. Fayette No. CA95-05-013, 1996 Ohio App. LEXIS 351, *2 (Feb. 5, 1996). This case strays from the accepted appellate standard of review. Following a thorough review of the record, the evidence does not establish cohabitation such that this court should overturn the findings of the trial court.

{¶ 48} The majority opinion uses selective facts to portray a narrative that Suann and Dan are unequivocally cohabitating. It is undisputed that Suann lived in Dan's house in Lima for a period of time in 2015 when she worked for Jean Schroeder Properties.[6] It is likewise undisputed that Suann and Dan are in a romantic relationship. There is no reason to doubt that their relationship includes the exchanging of gifts, intimacy, and support. However, while the facts cannot be disputed, the majority selectively amplifies these facts to support its finding of cohabitation. The majority then re-weighs the evidence in a manner that distorts this court's standard of review, which, as noted above, is whether the trial court's decision was supported by competent, credible evidence.

{¶ 49} The trial court heard testimony regarding the specific details of the relationship between Suann and Dan through five days of testimony. The trial court was able to observe Suann and Dan and their demeanor, gestures, and voice inflections. As part of this testimony, Suann and Dan denied cohabitation and testified about their separate lives, homes, finances, and even food preferences. Suann and Dan were then extensively cross-

6. {¶ a} During the trial Suann testified:

{¶ b} Dan Schroeder was living in Toledo and I needed to work on the properties and we hadn't figured out whether I should stay in a hotel. It was, basically, hey, you know, nobody's at my house. It would be nice to have somebody watching the house, seeing it on a daily basis to make sure it's okay. And then it gave me an opportunity to have a bed to sleep on.

examined with regard to bank accounts and receipts as to any shared expenses. The trial court heard this evidence and found Suann and Dan to be credible. As a result, the trial court found there was insufficient evidence that Suann and Dan shared expenses with respect to financing and day-to-day incidental expenses. Likewise, even though there was a period of time where Suann lived in Dan's home in Lima, the trial court found the evidence insufficient to meet the standard for cohabitation. *Keith*, 2011-Ohio-6532 at ¶ 11 ("cohabitation 'requires not only a relationship, sexual or otherwise, of a permanent, continuing nature, but also some sort of monetary support between the spouse and the paramour so as to be the functional equivalent of a marriage'"). As the trier of fact, this was well within the trial court's purview.

{¶ 50} Following a thorough review of the record, I simply cannot conclude that Suann and Dan have a relationship that is the "functional equivalent of a marriage." *Cravens v. Cravens*, 12th Dist. Warren No. CA2008-02-033, 2009-Ohio-1733, ¶ 10. Despite the majority's insistence otherwise, the facts contained in the record simply do not establish such a relationship as a matter of law. The facts here are not black and white, but rather a shade of gray. It is well-established that this court should not substitute its judgment for that of the trial court. The majority's decision in this case does just that. Therefore, because the trial court's decision was supported by competent, credible evidence, I must dissent in that I would overrule the first assignment of error.[7]

---

7. The majority's decision as to the termination date of spousal support is inequitable and manifestly unjust. An award of spousal support is a payment for both sustenance and support for a former spouse. R.C. 3105.18(A). As the record indicates, Bryan was ordered to pay spousal support in amounts ranging from $2,748 per month to as much as $7,000 per month. By setting the termination date as the date Bryan filed his motion to terminate, Suann will now be ordered to repay an amount that could easily eclipse $100,000. Until the majority's decision today, Suann was entitled to rely on those funds for her sustenance and support as ordered by the divorce decree.