[Cite as *Farrens v. Farrens*, 2026-Ohio-2357.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

FAYETTE COUNTY


| | | |
|---|---|---|
| COREY M. FARRENS, | : | |
| Appellee, | : | CASE NO. CA2025-08-021 |
| vs. | : | OPINION AND JUDGMENT ENTRY 6/22/2026 |
| AMATHA M. FARRENS, | : | |
| Appellant. | : | |
| | : | |


CIVIL APPEAL FROM FAYETTE COUNTY COURT OF COMMON PLEAS
DOMESTIC RELATIONS DIVISION
Case No. DRA 20210117


Rose & Dobyns Law Firm, and Scott B. Evans, for appellee.


Smith & Webb, Attorneys, and John D. Smith and Elaine M. Landis, for appellant.


## O P I N I O N


**M. POWELL, J.**

{¶ 1} Amatha Farrens appeals the decision of the Fayette County Court of Common Pleas, Domestic Relations Division, finding that she was cohabitating with her

boyfriend and therefore terminating an order directing her former husband, Corey Farrens, to pay her spousal support. Because we conclude that the cohabitation finding lacks sufficient evidentiary support, we reverse.

## I. Factual and Procedural Background

### A. The Divorce Proceedings and Spousal Support Award

{¶ 2}    Corey filed a complaint for divorce on April 16, 2021. An evidentiary hearing before a magistrate was held in 2023, and on December 26, 2023, the magistrate issued a decision on the divorce, including a spousal-support award. Corey objected, and on August 12, 2024, the trial court entered a judgment adopting the magistrate's decision with modifications. That judgment ordered Corey to pay Amatha spousal support of $20,000 per month for 39 months, beginning October 1, 2024. By its express terms, the support obligation "shall terminate upon Wife's remarriage or cohabitation with an unrelated adult or the death of either party." On October 14, 2024, the court entered an agreed final decree of divorce, which carried forward the same cohabitation language. Corey did not begin making payments until December 2024.

### B. Amatha's Relationship with Brian Leaming

{¶ 3}    Amatha and Brian Leaming had known each other since high school and began dating in August 2023. At that time, Leaming was renting a home from a friend but had to vacate in December 2023 when the friend's mother-in-law needed the property. Leaming had also attempted to purchase a farm during this period but withdrew from the transaction, leaving him without a place to live. Amatha offered him use of her guest bedroom, and he moved into her residence in late December 2023 or early January 2024. At some point during his stay, Leaming began sleeping in Amatha's bedroom rather than the guest room. Throughout this period, he kept the bulk of his belongings in a storage unit. Amatha did not charge Leaming rent, and he did not contribute to household

expenses, like electricity, trash, or internet service. He did, however, perform yard work and household tasks at the property, including replacing a light fixture in Amatha's cupola, mowing the lawn, and hauling and spreading mulch. His children from a prior relationship visited him at Amatha's residence during this time.

{¶ 4} Leaming moved out of Amatha's residence in March or April 2024 and went to live with his brother-in-law, Allen Stiffler, where he remained from approximately April 2024 through November 2024. He then stayed with Scott Bowen from November 2024 through early February 2025. On February 1, 2025, Leaming signed a one-year lease for a residence that has served as his primary residence ever since. He never again resided with Amatha. He never received mail at her address, never registered to vote there, never updated his driver's license to reflect her address, and had no key to her home.

### C. The Parties' Post-August 2024 Relationship

{¶ 5} From August 12, 2024, when spousal-support order was entered, forward, Leaming and Amatha maintained wholly separate residences and kept their finances entirely independent. They had no joint bank accounts, no shared credit cards, no shared insurance policies, and no shared cell phone plans. Neither party paid the other's rent, mortgage, or utilities, and neither appeared on the other's bills. Leaming did store his personal camper and his personal truck at Amatha's property without paying rent for the space. Amatha occasionally used Leaming's truck when she needed a vehicle capable of hauling items.

{¶ 6} The couple dined together one to three times per week, alternating who paid for the meals without any fixed pattern. They camped together with their respective children, splitting those expenses by having one party pay the campsite fee while the other purchased food for the trip. Leaming exercised parenting time with his children at Amatha's residence on some occasions and at his own residence or at campgrounds on

others. After August 12, 2024, Leaming spent one to two nights per week at Amatha's home, primarily on weekends, while residing elsewhere on a primary basis.

{¶ 7}   The couple took two trips together. The first was a vacation to Las Vegas for the National Finals Rodeo. Leaming's parents paid the airfare and provided a shared suite; Leaming and Amatha covered incidentals and took his parents to dinner as a gesture of thanks. The second was a trip to Hawaii that Amatha's employer offered as a performance incentive. The employer covered airfare, lodging, and a dinner; Amatha and Leaming paid for additional excursions and meals on their own. Both parties' children accompanied them on the Hawaii trip. In lieu of a traditional holiday card, Amatha arranged for a photographer to take a portrait of herself, her daughter, Leaming, and his two children, which she sent as a Christmas card to family, friends, and business customers.

### D. The Motion to Terminate and the Trial Court's Decision

{¶ 8}   On January 16, 2025, Corey moved to terminate spousal support retroactive to the date of Amatha's cohabitation or, alternatively, the date of the divorce decree. A hearing was held on June 24, 2025, at which Leaming, Amatha, and Corey all testified. The trial court found all three witnesses credible.

{¶ 9}   On July 24, 2025, the trial court issued its judgment. The court acknowledged that it was examining "the conduct of the parties from August 12, 2024, and thereafter," yet it also found that the couple had "maintained their relationship for almost two (2) years" and found that Leaming had "replaced a light fixture" and "mowed her lawn," activities the testimony established had occurred before April 2024. The court further found that the couple "share a bedroom at [Amatha]'s home." Concluding that the essential elements of cohabitation were satisfied, the court found that "[Amatha] and Brian Leaming share her residence and a bedroom (albeit not on a [sic] every night basis), they

- 4 -

provide financial assistance to each other, including food, shelter, use of vehicles, sharing expenses for camping and dining, storage of vehicles and camper." The court further found that Amatha "was cohabit[at]ing at the time of the issuance of the Decree of Divorce" and terminated spousal support effective August 12, 2024, the date of the original support order. Because Corey had made seven monthly payments totaling $140,000 since December 2024, the court ordered Amatha to reimburse the full amount.

{¶ 10} Amatha appealed.

## II. Analysis

{¶ 11} The single assignment of error alleges:

THE TRIAL COURT'S DECISION TO TERMINATE SPOUSAL SUPPORT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

## A. Standard of Review

{¶ 12} The parties disagree about the applicable standard of review. Corey urges abuse of discretion, citing *Kunkle v. Kunkle,* 51 Ohio St.3d 64, 67 (1990), and our decisions in *Schuh v. Schuh,* 2014-Ohio-4755, ¶ 10 (12th Dist.), and *McFarland v. McFarland,* 2019-Ohio-2673, ¶ 11 (12th Dist.). Amatha frames the issue as one of manifest weight. Each is partly right. The answer depends on which aspect of the trial court's ruling is at issue.

{¶ 13} There are, as we have recognized, layered inquiries. The overarching decision to terminate spousal support is reviewed for abuse of discretion. *See Justice v. Smith,* 2020-Ohio-1068, ¶ 6 (12th Dist.); *Delgado v. Delgado,* 2018-Ohio-4938, ¶ 22 (12th Dist.); *Hartman v. Hartman,* 2005-Ohio-4663, ¶ 13 (9th Dist.). But where termination rests on a factual finding of cohabitation, the underlying finding is reviewed under the competent, credible evidence standard, which is our formulation of manifest-weight

review when applied to questions of fact. *See Fox v. Fox*, 2014-Ohio-1887, ¶ 29 (12th Dist.); *Keith v. Keith*, 2011-Ohio-6532, ¶ 12 (12th Dist.); *Keeley v. Keeley*, 2000 WL 431362, *2 (12th Dist. Apr. 17, 2000). *Accord Hupp v. Hupp*, 2015-Ohio-3594, ¶ 8 (10th Dist.) (drawing this distinction). The trial judge is best positioned to view the witnesses, observe their demeanor and voice inflections, and use those observations in weighing credibility. *Keith* at ¶ 12.

{¶ 14} These standards interlock. Where a trial court terminates spousal support based on a cohabitation finding, and where that finding lacks support in competent, credible evidence, the termination is necessarily an abuse of discretion. A discretionary decision resting on facts the record does not support is, by definition, unreasonable. *See Justice* at ¶ 18, fn. 3 ("[W]here there is competent, credible evidence to support the trial court's decision, there is no abuse of discretion.").

{¶ 15} In practice, then, we will not disturb the trial court's cohabitation finding so long as it is supported by some competent, credible evidence going to all the essential elements. *Fox* at ¶ 29. But where the evidence, even viewed in the light most favorable to the judgment, fails to support an essential element of cohabitation, the judgment must be reversed.

### B. The Law of Cohabitation

{¶ 16} Cohabitation "contemplates a relationship that approximates, or is the functional equivalent of, a marriage." *Delgado*, 2018-Ohio-4938, at ¶ 24 (12th Dist.); *Fox*, 2014-Ohio-1887, at ¶ 27 (12th Dist.). It "equates to 'remarriage.'" *Hartman*, 2005-Ohio-4663, at ¶ 15 (9th Dist.), quoting *Gatto v. Gatto*, 1995 WL 434403, *1 (9th Dist. Jul. 19, 1995). The purpose of a cohabitation clause is to prevent a recipient spouse "'from eluding termination of spousal support as a consequence of remarriage, while obtaining the financial benefits thereof, by refusing to sanctify a meretricious relationship through a

marriage ceremony.'" *Id.*, quoting *Gatto* at *1. *Accord Bussey v. Bussey,* 55 Ohio App.3d 117, 118 (12th Dist. 1988). Put simply, where a recipient already enjoys the financial benefits of marriage from a new partner, the rationale for continued support from the former partner is diminished or eliminated.

{¶ 17} To determine whether cohabitation exists, courts consider three principal factors: "'(1) an actual living together; (2) of a sustained duration; and (3) with shared expenses with respect to financing and day-to-day incidental expenses.'" *Keith*, 2011-Ohio-6532, at ¶ 11 (12th Dist.), quoting *Shippy v. Shippy*, 2010-Ohio-5332, ¶ 28 (5th Dist.). The Ohio Supreme Court has distilled the inquiry to two essential elements: "(1) sharing of familial or financial responsibilities and (2) consortium." *State v. Williams,* 79 Ohio St.3d 459, 465, 1997-Ohio-79. Critically, cohabitation "requires not only a relationship, sexual or otherwise, of a permanent, continuing nature, but also some sort of monetary support between the [recipient] spouse and the paramour so as to be the functional equivalent of a marriage." *Barrett v. Barrett,* 1996 WL 307236, *10 (12th Dist. Jun. 10, 1996). Living together alone is not enough: "Without a showing of support, merely living together is insufficient to permit a termination of [spousal support]." *Thomas v. Thomas,* 76 Ohio App.3d 482, 485 (10th Dist. 1991); *Barrett* at *8; *Fox* at ¶ 28.

{¶ 18} With these principles in mind, we turn to the trial court's findings.

### C. The Trial Court's Reliance on Pre-Order Conduct

{¶ 19} We begin with Amatha's contention that the trial court improperly relied on evidence of conduct predating the August 12, 2024 spousal-support order in which the cohabitation clause first appeared.

{¶ 20} The trial court declared that "[i]n determining whether [Amatha] is in a cohabit[at]ing relationship with Brian Leaming, the Court examines the conduct of the parties from August 12, 2024, and thereafter." But the court's own findings belie that

declaration. The court found that the couple had "maintained their relationship for almost two (2) years." It found that Leaming had "replaced a light fixture" and "mowed her lawn"— activities the undisputed testimony places before April 2024. And it found that the two "share a bedroom at [Amatha]'s home," when the uncontested evidence is that Leaming moved out of Amatha's residence in March or April 2024 and has kept a separate residence ever since. These findings are intelligible only if the court factored into its cohabitation analysis the period from December 2023 through April 2024, during which Leaming temporarily stayed at Amatha's residence.

{¶ 21} This matters. Leaming's temporary stay ended roughly four months before the spousal-support order was entered. By August 12, 2024, he had been living with Allen Stiffler for several months. No cohabitation clause was in effect during the period of actual shared residency, and that period had ended well before the clause came into existence.

{¶ 22} Pre-order conduct is not categorically off-limits in a cohabitation inquiry. Where a court first establishes that cohabitation exists at or after the time the order is entered, evidence from before that date may permissibly supply context for the relationship's nature and trajectory. *See Hosler v. Hosler,* 2018-Ohio-4486, ¶ 11-23 (12th Dist.) (examining pre-decree relationship where cohabitation persisted through and beyond the decree). But where, as here, the shared-living arrangement ended months before the order took effect and the parties were no longer residing together when the cohabitation clause came along, pre-order conduct cannot supply what the post-order evidence lacks.

{¶ 23} A court cannot simultaneously claim to limit its analysis to post-order conduct and rest its findings almost entirely on pre-order facts. The contradiction points to a deeper problem here. Set the pre-order evidence aside, and the post-order record does not support a finding of cohabitation. And whether considered separately or in

combination, neither period satisfies the cohabitation standard. We explain by examining each of the three cohabitation factors in turn.

### D. Actual Living Together of a Sustained Duration

{¶ 24} The first two factors require "an actual living together" "of a sustained duration." *Keith*, 2011-Ohio-6532, at ¶ 11 (12th Dist.).

{¶ 25} During the post-order period, from August 12, 2024, forward, the undisputed evidence is this: Leaming lived with Allen Stiffler from approximately April 2024 through November 2024; he then stayed with Scott Bowen from November 2024 through early February 2025; and he signed a one-year lease at his own residence beginning February 1, 2025. Throughout the period following the spousal-support order, Leaming maintained a separate residence. His testimony, which the trial court found credible, was that he spent one or two nights per week at Amatha's residence, primarily on weekends.

{¶ 26} Weekend overnight visits at a girlfriend's home, while maintaining a separate primary residence, are not "actual living together" as we have used that phrase. In one case, we found no cohabitation where the paramour spent three to four nights per week at the recipient spouse's home but kept his own residence. *Fox*, 2014-Ohio-1887, at ¶ 31, 34 (12th Dist.). In another case, we upheld a no-cohabitation finding where the paramour's vehicle was "frequently" at the ex-wife's home and he "often" spent the night, but the two maintained separate residences. *Burns v. Burns,* 2012-Ohio-2850, ¶ 11 (12th Dist.). And in a third case, we found no cohabitation even where the paramour's vehicle was observed at the recipient spouse's home 113 out of 129 days. *Cravens v. Cravens,* 2009-Ohio-1733, ¶ 12, 17 (12th Dist.). These cases demonstrate that frequent presence at a paramour's home, without more, is not "actual living together."

{¶ 27} The trial court's finding that Amatha and Leaming "share her residence and a bedroom (albeit not on a [sic] every night basis)" cannot bear the weight the court placed

- 9 -

on it. Once or twice a week is not every night. The parenthetical acknowledgment that the arrangement did not occur "on a [sic] every night basis" only underscores how far it fell from actual cohabitation. Leaming kept his furniture in storage (and later at his own leased residence), never received mail at Amatha's address, never registered to vote there, never listed her address on his driver's license, and had no key to her home. These are not the hallmarks of a shared residence.

{¶ 28} Corey points to two cases as supporting the trial court's finding. But in the one case, the recipient spouse was staying at her paramour's home 28 to 30 days out of the month, rarely returning to her own home "for more than a few hours at a time." *Hosler*, 2018-Ohio-4486, at ¶ 17 (12th Dist.). And in the other case, the recipient spouse had actually moved into her paramour's home for a three-month stretch and was living there full-time. *Justice,* 2020-Ohio-1068, ¶ 10-13 (12th Dist.). Neither case involved parties merely spending weekends together while maintaining wholly separate residences.

{¶ 29} During the pre-order period, even if we were to consider Leaming's five-month stay at Amatha's home from December 2023 through April 2024—a period the trial court purported not to rely on—that period does not satisfy the cohabitation standard either. Five months of shared living can, in principle, satisfy the sustained-duration requirement. *See Hupp*, 2015-Ohio-3594, at ¶ 10 (10th Dist.). But the circumstances here undermine any inference of permanence that duration might otherwise suggest. Leaming had lost his housing after a farm purchase fell through, was looking for a new place, kept his belongings in storage, and testified that he "was trying to find a place the whole time." When he found alternate housing in April 2024, he left. A temporary stay of convenience, without more, is not the sustained living arrangement we have required. And critically, even during this stretch, the financial interdependence necessary to establish cohabitation was wholly absent, as we explain next.

## E. Shared Expenses and Financial Interdependence

{¶ 30} The third factor, shared expenses with respect to financing and day-to-day incidental expenses, is the one we have most consistently identified as indispensable. It is also a factor on which the trial court's analysis falls short.

### 1. The Financial Evidence

{¶ 31} The financial evidence the trial court identified consisted of the following: Amatha provided Leaming with food, storage for his camper and personal truck, and a place to stay on weekends; Leaming occasionally mowed Amatha's yard and replaced a light fixture; the couple alternated paying for restaurant meals one to three times per week and split camping expenses; they traveled together to Hawaii (paid for by Amatha's employer) and Las Vegas (paid for by Leaming's parents); and Amatha used Leaming's truck when she needed to haul items.

{¶ 32} Even taken in its entirety and in the light most favorable to the trial court's finding, this evidence does not establish the kind of financial interdependence that constitutes the functional equivalent of a marriage.

{¶ 33} Consider what is absent from this record. There are no joint bank accounts, no shared credit cards, no shared insurance policies, no joint ownership of property, and no shared cell phone plans. Neither party pays the other's rent, mortgage, or utilities. Neither party is on the other's bills. And there is no evidence that either party provides the other with regular financial support of the kind that would reduce or replace the need for spousal support.

{¶ 34} We have repeatedly held that similar or even stronger evidence of financial interaction was insufficient to establish cohabitation. In *Cravens,* the paramour was at the recipient spouse's home with extraordinary frequency—113 of 129 days—occasionally bought groceries and cooked dinner, and the families did social activities together.

*Cravens*, 2009-Ohio-1733, at ¶ 12, 14-16 (12th Dist.). We affirmed the finding of no cohabitation because there was "no evidence in the record of financial support flowing between [the parties] so as to constitute the functional equivalent of a marriage." *Id.* at ¶ 17. In *Fox,* the paramour made substantial repairs and improvements to the property where the recipient spouse lived, mowed the grass, stored a lawnmower on the property, installed fish tanks and rabbit cages for the children, and spent three to four nights a week at the home. *Fox*, 2014-Ohio-1887, at ¶ 31-33 (12th Dist.). We upheld the no-cohabitation finding. *Id.* at ¶ 38. In *Burns,* we affirmed a no-cohabitation finding where the paramour frequently stayed overnight but the parties maintained separate residences and there was no evidence of shared finances. *Burns*, 2012-Ohio-2850, at ¶ 11-13 (12th Dist.). And in *Binks,* we did the same where there was no evidence that the paramour supported the ex-spouse or that the two had shared finances. *Binks v. Binks,* 2019-Ohio-17, ¶ 32 (12th Dist.).

{¶ 35} The evidence here is no more compelling than the evidence in *Cravens, Fox, Burns,* and *Binks.* Alternating who picks up the restaurant check, splitting camping expenses, and using each other's vehicles on occasion are the hallmarks of a dating relationship, not the financial interdependence of a marriage. These are precisely the kinds of incidental, reciprocal courtesies that exist in ordinary romantic relationships between adults who each maintain their own households and pay their own way.

## 2. Corey's Specific Arguments

{¶ 36} Corey emphasizes several features of the relationship that warrant individual attention. The storage of Leaming's camper and truck at Amatha's property is a convenience, not financial support; there is no evidence that Amatha charged rent or that Leaming's use of the space imposed any meaningful cost. The family Christmas card, while evidence of a close relationship, is not evidence of financial interdependence.

Leaming's exercise of parenting time with his children at Amatha's residence reflects the practical logistics of weekend visits, not the assumption of familial obligations equivalent to marriage. And the two vacations the couple took were funded by third parties, not by pooled resources. Neither reflects the kind of mutual financial planning and shared expenditure that characterizes a marital-equivalent partnership.

{¶ 37} Corey also cites the Second District's decision in *Perri* for the proposition that "'another purpose sought to be achieved by a cohabitation clause . . . is to prevent a person who is receiving support from using those funds to support another individual.'" *Perri v. Perri,* 79 Ohio App.3d 845, 848 (2d Dist. 1992) (quoting the trial court's decision). But the undisputed evidence here does not show that Amatha was using her spousal support to sustain Leaming. Leaming maintained his own separate residence and had his own income throughout the relevant period. Indeed, the spousal-support payments did not begin until December 2024. There is no basis in this record for concluding that Amatha was channeling her spousal support to Leaming's benefit.

{¶ 38} By contrast, in cases where we have upheld a cohabitation finding, the financial entwinement has been far more extensive. In *Keeley,* the paramour and the recipient spouse jointly purchased a home and shared provisions for shelter, food, and utilities. *Keeley*, 2000 WL 431362, at *2 (12th Dist. Apr. 17, 2000). In *Hosler,* there were cash transfers, checks, and direct deposits into the recipient spouse's checking account; the paramour paid for gas and vehicle repairs; the recipient spouse was added to the paramour's cell phone plan; and the recipient spouse performed domestic duties including cooking, vacuuming, watering plants, and running errands. *Hosler*, 2018-Ohio-4486, at ¶ 25, 30, 33 (12th Dist.). In *Guggenbiller,* the paramour and recipient spouse had deliberate conversations about how to structure their activities to avoid triggering the cohabitation clause, a strong indicator that both understood their relationship had crossed the line into

financial interdependence. *Guggenbiller v. Guggenbiller,* 2011-Ohio-3622, ¶ 16, 18 (9th Dist.). Nothing comparable appears in the record of the case before us.

### 3. Consortium Alone Is Not Sufficient

{¶ 39} We note that cohabitation requires both the sharing of familial or financial responsibilities and consortium. *Williams*, 79 Ohio St.3d at 465; *accord Keith*, 2011-Ohio-6532, at ¶ 11 (12th Dist.) ("'an actual living together'"). The record contains evidence of consortium. Amatha and Leaming are in an exclusive romantic relationship, they spend weekends together, they vacation together, they share time with each other's children, and they sent a family Christmas card. But consortium cannot substitute for the financial interdependence that defines cohabitation in the spousal-support context.

{¶ 40} Cohabitation clauses serve the specific purpose of terminating support when a recipient spouse is receiving the financial benefits of a marriage-equivalent relationship, thereby reducing or eliminating the independent need for support from the former spouse. *Hartman*, 2005-Ohio-4663, at ¶ 15 (9th Dist.); *Bussey*, 55 Ohio App.3d at 118 (12th Dist. 1988). If "merely living together is insufficient" to terminate support without a showing of financial interdependence, *Thomas*, 76 Ohio App.3d at 485 (10th Dist. 1991), the same logic applies with equal force to merely being romantically and socially intertwined. Our decision in *Cravens* confirms the point. The parties there did social activities together, their families interacted, and the paramour was frequently present at the recipient spouse's home, yet there was no cohabitation precisely because the financial element was absent. *Cravens*, 2009-Ohio-1733, at ¶ 17 (12th Dist.). Consortium is a necessary element of cohabitation, but it is not a sufficient one.

### 4. The Totality-of-Circumstances Argument

{¶ 41} We recognize that cohabitation is "a question of fact best determined by the trial court on a case-by-case basis." *Keith* at ¶ 12. And we are mindful of Corey's argument

- 14 -

that the trial court was entitled to consider all the evidence, and that individual factors may together paint a picture of cohabitation when viewed in totality.

{¶ 42} But even viewing the evidence in totality and in the light most favorable to the judgment, the picture that emerges is not the functional equivalent of a marriage. It is a picture of two adults in an exclusive dating relationship who maintain separate residences, pay their own bills, keep their finances independent, and share occasional social expenses in the manner typical of dating couples. The test for cohabitation is not whether the sum of non-financial factors impresses the trial court but whether the parties have assumed, in practice, the mutual financial obligations that justify treating the relationship as marriage-equivalent. *See Barrett*, 1996 WL 307236, at *10 (12th Dist. Jun. 10, 1996) (cohabitation requires "some sort of monetary support . . . so as to be the functional equivalent of a marriage"). Where, as here, financial interdependence is largely absent, evidence of consortium and weekend visits cannot bridge that gap.

{¶ 43} The trial court's finding that "[e]ach derives financial benefit under the current arrangements from the other" sets the bar too low. The question is not whether two people in a dating relationship ever derive any incidental benefit from each other's company or resources. The question is whether the relationship involves the sharing of financial responsibilities so as to be the functional equivalent of a marriage. A standard that equates any reciprocal benefit between dating partners with the financial interdependence of marriage would be too broad.

{¶ 44} In arriving at its cohabitation finding, the trial court credited the testimony of all witnesses. But credible testimony must still support the legal conclusion drawn from it. A trial court's assessment of witness credibility is entitled to deference, but the legal significance of the facts those witnesses established is a question we review independently. *See Hupp*, 2015-Ohio-3594, at ¶ 8 (10th Dist.). The problem here is that

the credible and undisputed testimony does not establish cohabitation as the law defines it.

## F. The Retroactive Termination Date

{¶ 45} Even were we to sustain a cohabitation finding on this record, the retroactive termination date would independently require reversal. The trial court found that "[Amatha] was cohabit[at]ing at the time of the issuance of the Decree of Divorce" and terminated spousal support effective August 12, 2024, the date of the original spousal-support order.

{¶ 46} We recognize that retroactive termination upon a cohabitation finding is permissible when the decree provides that support shall terminate "upon" cohabitation. *Keeley*, 2000 WL 431362, at *3 (12th Dist. Apr. 17, 2000); *Dyrdek v. Dyrdek,* 2010-Ohio-2329, ¶ 20 (4th Dist.); *Jennings v. Jennings,* 1995 WL 628336, *2 (8th Dist. Oct. 26, 1995). But in each of those cases, the evidence established that the parties were actually cohabitating on the retroactive date the court selected. In *Keeley,* the parties were living together in a jointly purchased home as of that date. In *Dyrdek,* the cohabitation was ongoing throughout the retroactive period. And in *Jennings,* the parties stipulated to the date they moved into a jointly owned condominium.

{¶ 47} This case is different. The trial court set the retroactive termination date at August 12, 2024. On that date, Leaming was living with Allen Stiffler, not with Amatha. He had been living apart from Amatha for roughly four months. Even under the trial court's own analysis, nothing supports a finding that cohabitation existed on that particular date. The practical effect of the retroactive termination is to nullify the spousal-support award in its entirety, requiring Amatha to repay every payment she had received. The record does not support that result.

- 16 -

### III. Conclusion

{¶ 48} The credible and undisputed testimony establishes that Amatha and her paramour were in an exclusive dating relationship—one in which they maintained separate residences, paid their own bills, kept their finances independent, and split occasional social expenses in the way dating couples typically do. That is not the functional equivalent of a marriage that the law requires for a finding of cohabitation. The trial court's contrary finding lacks evidentiary support, and the resulting termination of spousal support is therefore an abuse of discretion.

{¶ 49} The assignment of error is sustained, and the trial court's judgment is reversed.

BYRNE, P.J., concurs.

PIPER, J., dissents.

**PIPER, J., dissenting.**

{¶ 50} I dissent from much of my colleagues' interpretation of the testimony as well as the decision not to remand for a new hearing. The trial court was reasonable in evaluating and weighing the evidence, however the weight of evidence regarding the extent of duration necessary for the legal term of cohabitation remains in question. For that reason, I must part ways with my colleagues and dissent from their inadvertent reweighing of the evidence and the substitution of their interpretations of the testimony to render a judgment different from that of the trial court.[1]

---

1. The Ohio Supreme Court has instructed appellate courts to remain mindful of the presumption in favor of the finder of fact; in this case that cohabitation was established. The trial judge is best able to observe the witnesses, view their gestures and demeanor, and hear their tone and inflections, and to use these observations to evaluate and weigh the proffered testimony. *In re Z.C.*, 2023-Ohio-4703, ¶ 14. Appellate review must not substitute its judgment for that of the trial court. If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with sustaining the trial court's verdict and judgment. *Id.* at ¶ 14-15.

{¶ 51} The majority agrees with Amatha's argument that the trial court based its findings "on pre-order facts," to which Amatha registered a continuing objection. I do also. Corey's brief concedes that the record must demonstrate a sustained duration existed to establish cohabitation. To emphasize the harm, Amatha argues that considering a period when she and Brian were not living together, but only dating, prejudiced the trial court's implied determination of the duration necessary for finding cohabitation existed. This determination is complicated by the undisputed evidence that Brian had, and possibly still has, multiple residences.[2]

{¶ 52} Amatha's assignment of error states:

THE TRIAL COURT'S DECISION TO TERMINATE SPOUSAL SUPPORT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 53} Evidence not germane to "sustained duration" prejudiced the outcome, and remand for a new hearing is the remedy because the weight of the evidence on sustained duration was compromised. If appellate review determines that the trial court's judgment is against the manifest weight of the evidence, "the proper remedy is a remand for a new trial." *In re Z.C.*, 2023-Ohio-4703, ¶ 16. Therefore, given that a new trial is the proper remedy in this case, I would reverse the trial court's judgment and remand for further proceedings, without much of the analysis offered by my colleagues.

{¶ 54} Again, with respect, I find that the majority opinion goes too far in its extrapolations and in downplaying the significance of undisputed facts. For one example, my colleagues misinterpret Amatha and Brian's "family" Christmas card as evidence only of a "close relationship," even though we all know that family Christmas cards typically

---

2. The trial court found that Brian does not always stay at Amatha's residence and the record lacks clarity of a "sustained duration." The record does not indicate the "pre-order" evidence came in for a limited purpose. Complicating appellate review is the trial court's repeated characterization of the relationship as "dating." Dating differs from cohabitation or consortium as defined by law.

portray the perception of a *family,* represent a marital relationship, and that families share "financial interdependence." Merely because my colleagues can arrive at an inference the photograph only depicts "a close relationship" does not mean a different, but reasonable, inference to the contrary is dismissed.[3]

{¶ 55} For an unknown purpose the majority opines that living together is insufficient to establish cohabitation and it is emphasized that staying together did not occur "every night." However, "every night" is not required, and in this case, the undisputed testimony goes far beyond randomly living together or occasionally sharing a residence. Although it was not the same nights every week, a consistency or pattern could reasonably be inferred from the testimony. I find dialogue in the majority opinion overly stated and subject to being misconstrued.

{¶ 56} My colleagues also attempt to diminish evidence of shared expenses by examining costs in isolation and then finding there was no "meaningful cost." However commonsensically, the value of storage space, vehicle use, services for household maintenance and repair, and the shared costs of fees, travel, leisure, and food collectively amount to a value that a reasonable factfinder would consider meaningful. My colleagues forget that our court has previously acknowledged the importance of considering "shared expenses" and "day-to-day incidental expenses" in cases like this. *See Keith v. Keith*, 2011-Ohio-6532, ¶ 11 (12th Dist.).

{¶ 57} The majority opinion unnecessarily cites case law involving evidence and circumstances different from those herein. Yet the evidence and circumstances of a particular case are decided by a trial judge on a case-by-case basis. *Delgado v. Delgado*, 2018-Ohio-4938, ¶ 23 (12th Dist.). "Consequently, an appellate court will not overturn a

---

3. A challenge to the manifest weight of the evidence requires "all reasonable inferences " be considered. *In re S.F.,* 2026-Ohio-1502, ¶ 21 (12th Dist.).

trial court's finding in regard to cohabitation as long as it is supported by some competent, credible evidence." *Id*. We must not stray from the presumption in favor of the trial judge as finder-of-fact when premised on competent, credible evidence.

{¶ 58} With the weight of evidence regarding sustained duration being undermined and not clearly determined by the trial court, the analysis need not go further. Our precedent clearly discusses the principal factors necessary for cohabitation, which the parties acknowledge as controlling. *See Keith; see also Justice v. Smith*, 2020-Ohio-1068 (12th Dist.). Therefore, the trial court lost its way, and the manifest weight argument must be sustained. The trial court's judgment must be reversed, and the matter remanded for a new hearing.

## J U D G M E N T   E N T R Y

The assignment of error properly before this court having been ruled upon, it is the order of this court that the judgment or final order appealed from be, and the same hereby is, reversed.

It is further ordered that a mandate be sent to the Fayette County Court of Common Pleas, Domestic Relations Division, for execution upon this judgment and that a certified copy of this Opinion and Judgment Entry shall constitute the mandate pursuant to App.R. 27.

Costs to be taxed in compliance with App.R. 24.

*/s/ Matthew R. Byrne, Presiding Judge*

*/s/ Mike Powell, Judge*